UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――

JAMES M. WEST (89-A-6906),

                Plaintiff,

      v.

GLENN S. GOORD, et. al.,

                Defendants.

―――――――――――――――――――――――――

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' STATEMENT OF <u>UNDISPUTED FACTS</u>**

Case No.: 05-CV-447

        Plaintiff James M. West, by his attorneys, Phillips Lytle LLP, and pursuant to

Rule 56.1(a)(2) of the Local Rules of Civil Procedure for the United States District Court for

the Western District of New York ("Local Rule 56.1"), hereby objects and responds to

Defendants' Statement of Undisputed Facts ("Statement") [Dck. No. 102-2] and, further,

provides evidence of the genuine issues of material fact that preclude Defendants'

entitlement to summary judgment in this action.

    **A.**    **The Statement does not comply with Local Rule of Civil Procedure 56**

        Initially, Plaintiff objects the Statement, on the grounds that it does not

comply with the requirements of Local Rule 56(a)(1), which requires that the movant shall

annex a "separate, short, and concise statement, in numbered paragraphs, of the *material*

facts as to which the moving party contends there is no genuine issue to be tried." L. R.

Civ. P. 56(a)(1) (emphasis added). Facts are "material" when they "might affect the

outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Although

Defendants state that all one hundred thirty-one facts are "material," they include various

facts that are immaterial to the dispute in this action.  (*See e.g.*, Statement ¶¶ 4, 9, 21, 24, 25, 50, 53, 54, 87, 88, 89, 90, 93).

Moreover, the Statement requires that Plaintiff and the Court sift through and review exhibits and various attachments filed in the Court's docket.  (Statement at ¶¶ 2, 55, 108, 110).  "'The purpose of Local Rule 56 is to aid the court, by directing it to the material facts that the movant claims are undisputed and that the party opposing the motion claims are disputed ... [and][a]bsent such a rule, the court is left to dig through a voluminous record, searching for material issues of fact without the aid of the parties.'"  *Carovski v. Jordan*, No. 06-CV-716S, 2011 WL 1362624, at *3 (W.D.N.Y. Apr. 11, 2011) (quoting *Wilks v. Elizabeth Arden, Inc.*, 507 F. Supp. 2d 179, 184-185 (D. Conn. 2007)).  Defendants' noncompliance with Local Rule 56 is grounds for denial of the Motion.  *Id.* (denying summary judgment for a movant's lack of specificity in a Statement of Undisputed Facts); Local Rule 56(a)(1).  Accordingly, Defendants' motion should be denied.

## B.    Plaintiff's responses to the Statement.

Notwithstanding said objection, Plaintiff provides the following responses to Defendants' Statement.  The paragraph numbers for the following responses refer to the corresponding numbers in Defendants' Statement:

### Defendants' Statement ¶ 1:

At all times relevant to the instant matter, James M. West (89-A-6906), the plaintiff herein, was an inmate in the New York State Department of Corrections and Community Supervision ("DOCCS"), housed at Five Points Correctional Facility ("Five Points").  Dck. No. 29, ¶ 21.

### Plaintiff's Response:

Undisputed.

**Defendants' Statement ¶ 2:**

At all times relevant to this complaint, Defendants Glenn S. Goord, Stephan Bernardi, Thomas Poole, Thomas Eagan, Julie Dennis, Janice Henrich, Lisa Lauber, David Napoli, Donald Selsky, Lucien Leclaire, Jeffery Case, Ray Pabon and Joseph Keefe (collectively "defendants") were employees of DOCCS.  Complaint Dck. No. 29, ¶¶ 22-34.

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 3:**

At all times relevant to this complaint, Defendants Poole, Napoli, Henrich, Lauber, Case, Pabon and Keefe were assigned as staff at Five Points.  *Id.*

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 4:**

Plaintiff alleges that his Eighth Amendment rights were violated when he was denied due process during his impeachment hearing; harassed and retaliated against by the withholding of reasonable accommodations and medical equipment, for filing grievances against and writing letters regarding the Inmate Grievance Resolution Committee ("IGRC"); and denied proper medical care when he was not provided adequate wheelchair maintenance, hand/wrist splints and, in 2002, a sufficient supply of and/or proper catheters.  *See* Dkt. No. 29.

**Plaintiff's Response:**

Undisputed with respect to Plaintiff's allegation that his rights under the Eighth

Amendment to the United States Constitution were violated when he was denied adequate

wheelchair maintenance, hand/wrist splints, and a sufficient supply of proper catheters.

The remaining statements are disputed.  With respect to the denial of due process at the

impeachment hearing, Plaintiff alleges a violation of his due process rights under the

Fourteenth Amendment, and actionable under 42 U.S.C. § 1983.  (*See* Exhibit 1 to the

Declaration of James West, dated January 20, 2017 ("West Dec."), with exhibits

("Complaint") at ¶ 146).  With respect to the withholding of reasonable accommodation,

Plaintiff has stated various statutory claims that do not involve the Eighth Amendment.

(Complaint at ¶¶ 121,136, 183, 184).  Finally, with respect to the retaliatory actions taken by

Defendants, Plaintiff stated claims for a violation of his First Amendment rights.

(Complaint at ¶¶ 76, 78, 85, 86, 99, 102, 104, 119, 180, 185).

**Defendants' Statement ¶ 5:**

Plaintiff alleges that Defendants discriminated against him by failing to provide a wheelchair accessible desk in violation of the Americans with Disability Act ("ADA") and § 504 of the Rehabilitation Act.  *Id.* at ¶¶ 181-183.

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 6:**

Plaintiff alleges that Defendants discriminated against him, based upon his race, when he was not permitted to conduct IGRC investigations throughout the facility in violation of Title VII and his right to equal protection.  *Id.* at ¶¶184, 187.

**Plaintiff's Response:**

Undisputed, with clarification.  Plaintiff also alleges that, because he is bound to a

wheelchair, the actions of Defendants violated the ADA and Rehabilitation Act.

(Complaint at ¶ 183).

**Defendants' Statement ¶ 7:**

Plaintiff alleges that Defendants conspired against him in violation of §1985(3) and § 1986.  *Id.* at ¶ 186.

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 8:**

Finally, Plaintiff alleges that Defendants Goord, Bernardi, Poole, Eagan, Dennis, Selsky and Leclaire were aware of said incidents and failed to stop and/or prevent them

from taking place and have therefore also violated his Eighth Amendment rights.  *Id.* at
¶ 189.

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 9:**

Plaintiff alleges that his Eighth Amendment rights were violated when he was denied
due process during his Inmate Grievance Resolution Committee ("IGRC") Impeachment
Hearing.  *Id.* at ¶ 146.

**Plaintiff's Response:**

Disputed.  Defendants cite to paragraph ¶ 146 of the Complaint, which makes no

reference to the Eighth Amendment.  With respect to the impeachment hearing, Plaintiff

alleges that Defendants violated his due process rights guaranteed to him under the

Fourteenth Amendment, and actionable under 42 U.S.C. § 1983.  (Complaint at ¶ 188).

**Defendants' Statement ¶ 10:**

The plaintiff was served with the Recommendation for Impeachment on October 21,
2003 and the Impeachment Hearing began on October 28th.  *See* Ex. I, pp. 69, 71, 72.

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 11:**

The plaintiff requested to call approximately thirty-eight (38) witnesses, including
twenty-one (24) [*sic*] DOCCS staff members and fourteen (14) inmates, one of whom was
housed at Upstate Correctional Facility.  *Id.* at 105-106.

**Plaintiff's Response:**

Undisputed, with clarification.  Defendants' citation to pages 105 and 106 of

Exhibit I to the Declaration of Denetra Roberts, Esq. ("Roberts Dec.") demonstrates that

Plaintiff attempted to call twenty-eight (28) total witnesses, instead of the thirty-eight (38)

that Defendants allege.  Additionally, Defendants' contention that Plaintiff attempted to call
"twenty-one (24) [*sic*] DOCCS staff members and fourteen (14) inmates" is not supported by
pages cited.  However, the complete witness list includes an additional page of witnesses
submitted by Plaintiff on October 24, 2003.  (Roberts Dec. Ex. I, at p. 91).

**Defendants' Statement ¶ 12:**

     Testimony from twenty-five witness was heard during the course of Plaintiffs
hearing.  *Id.*

**Plaintiff's Response:**

     Undisputed.

**Defendants' Statement ¶ 13:**

     Four of Plaintiffs requested witnesses, Inmates, Flores, McCarthy, Gray and Peraza,
refused to testify.  *Id.* at 102-104; Ex. H, p. 140.

**Plaintiff's Response:**

     Undisputed.

**Defendants' Statement ¶ 14:**

One witness, inmate K. Hobbs, was no longer housed at Five Points and Plaintiff concedes
that he had no knowledge of the incidents surrounding the charges against the plaintiff.
Ex. I, p. 97; West Dep. pp. 148-150.

**Plaintiff's Response:**

     Undisputed.

**Defendants' Statement ¶ 15:**

     Plaintiff was denied his request to call Commissioner Goord, Dep. Commissioners
Patterson, Annucci, and Bernardi, Thomas Egan, and Julie Dennis, all located in DOCCS
Central Office, and Supt. Thomas Poole, DSP Weingarter and DSS Napoli, located at Five
Points.  Said witnesses were deemed immaterial as they lacked direct knowledge of the
issues regarding Plaintiffs impeachment hearing.  *See* Ex. I, pp. 98-101.

**Plaintiff's Response:**

Undisputed, with clarification.  Defendant Napoli determined that these witnesses were immaterial.  (West Dec. ¶¶34-35 & Ex. 11).

**Defendants' Statement ¶ 16:**

Plaintiff testified that his request to call inmates Hauk, Divine, Campbell, Millard and Lashley was denied.  *See* Ex. H., p. 146; Dck. 29, ¶ 145.

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 17:**

However, the evidence call-out list used during the trial indicates that Inmate Campbell testified at Plaintiffs impeachment hearing on October 30, 2003.  Ex. I, pp. 105-106.

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 18:**

Inmates Hauck, Divine, Millard and Lashley were not listed as potential witnesses on the plaintiffs witness lists.  *Id.* at 91 & 94.

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 19:**

Plaintiff testified that inmates Divine and Lashley had no knowledge of the incidents surrounding the charges against the plaintiff.  *See* Ex. H, pp. 148-149.

**Plaintiff's Response:**

Disputed.  Plaintiff testified that inmates Divine and Lashley were witnesses to his

request for accommodation through a wheelchair accessible desk, Defendant Lauber

instructing him to work faster, and discriminatory statements made to Plaintiff by

Defendant Lauber.  (Deposition of James West ("West Dep.") attached as Exhibit 7 to the

Declaration of Amanda Lowe, Esq. in Opposition to Defendants' Motion for Summary

Judgment, sworn to January 30, 2017 ("Lowe Dec."), at pp. 147-148).  Thus, issues of fact

remain as to whether Plaintiff was denied due process guaranteed to him by the Fourteenth

Amendment when Defendant Napoli solely precluded inmates Divine and Lashley from

testifying on behalf of Plaintiff at his IGRC impeachment hearing.

**Defendants' Statement ¶ 20:**

Plaintiff agreed to adhere to the IGRC Code of Ethics.  *See* Ex. I, p. 77.

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 21:**

Defendant Lauber testified that she spoke with the plaintiff regarding his adversarial
behavior before reducing it to writing as it was her practice to use verbal communication as
a first step when an issue arose with an inmate.  *See* Ex. D., p. 65-66, 95, 118.

**Plaintiff's Response:**

Undisputed, with clarification.  It is undisputed that Defendant Lauber testified that

it was her practice to use verbal communication before documenting adverse behavior.  (*See*

Roberts Dec. Ex. D, Deposition Transcript of Lisa Lauber, taken November 30, 2015

("Lauber Dep."), at p. 65).  However, Plaintiff testified that Defendant Lauber first spoke to

Plaintiff to inform him of his written informal report.  (West Dep. at 163-165).

**Defendants' Statement ¶ 22:**

Plaintiff was issued several informal and formal counseling memos prior to the
impeachment charges being filed.  *See* Ex. I, pp.78-79, 82-85.

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 23:**

Said memos outlined in great detail the actions repeatedly taken by the plaintiff
which served to undermine the IGRC program and violate its code of ethics.  *Id.*

**Plaintiff's Response:**

Disputed.  The facts underlying the issuance of the memoranda are presently in dispute.  Moreover the memoranda demonstrate a retaliatory action against Plaintiff for his participation on the IGRC and by filing grievances, which were protected actions under the First Amendment.  (West Dep. at p. 166).  Thus, an issue of fact remains as to whether Plaintiff's conduct "undermine[d] the IGRC program."  (Statement at ¶ 23).

**Defendants' Statement ¶ 24:**

Defendant Henrich also wrote several Observation memos detailing Plaintiffs inappropriate behavior.  *See* Ex. I, pp. 80-81, 87 & 87-a.

**Plaintiff's Response:**

Disputed.  The inappropriate behavior alleged by Defendants was either an exercise of Plaintiff's protected actions under the First Amendment, or were the result of his inability to complete his work due to Defendants' failure to accommodate his disability.  (West Dec. at ¶¶ 22, 23, 32).  Issues of fact remain in dispute as to whether the conduct was "inappropriate."

**Defendants' Statement ¶ 25:**

Plaintiff alleges that his Eighth Amendment rights were violated when he was harassed and retaliated against by the withholding of reasonable accommodations and medical equipment, for filing grievances against and writing letters regarding the Inmate Grievance Resolution Committee ("IGRC").  Specifically, a wheelchair accessible desk, hand splints, a pusher, an in-cell assist and proper wheelchair maintenance.

**Plaintiff's Response:**

Disputed.  Defendant alleges as fact, and without citation, that Plaintiff alleges that his rights guaranteed under the Eighth Amendment to the United States Constitution were violated "when he was harassed and retaliated against by the withholding of reasonable accommodations and medical equipment."  To the contrary, Plaintiff's retaliation claim is

based on Defendants' retaliation against Plaintiff for his participation on the IGRC, and for

engaging in activities protected by the First Amendment to the United States Constitution.

(Complaint at ¶¶ 76, 78, 85, 86, 94).  Moreover, the retaliatory action was the impeachment

of Plaintiff from the IGRC.  (West Dec. at ¶¶ 32, 39).

**Defendants' Statement ¶ 26:**

Plaintiff never filed an ADA reasonable accommodation request for a wheelchair
accessible desk.  (*See* Declaration of Laurine Jones in Support of Defendants' Motion for
Summary Judgment, sworn to December 1, 2016 [Dck. 102-5] ("Jones Dec."), ¶ 18).

**Plaintiff's Response:**

Disputed.  Defendant vaguely alleges that Plaintiff never "filed" an ADA reasonable

accommodation request from Defendants.  To the contrary, Plaintiff orally requested

accommodation from Defendants for a wheelchair accessible desk in the Inmate Grievance

Program ("IGP") office but no action was taken in response.  (West Dec. at ¶ 17; West Dep.

94-96).  Thus, an issue of fact remains as to whether Plaintiff requested accommodation

from Defendants for a wheelchair accessible desk in the IGP office.

**Defendants' Statement ¶ 27:**

Plaintiff testified that he requested a wheelchair accessible desk from Defendants
Henrich, Lauber, Case, Pabon and Keefe.  (West Dep. at pp. 69, 95-97, 124, 132, 193).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 28:**

Defendants Lauber, Case, Pabon and Keefe deny that any such request for a
wheelchair accessible desk was received.  (*See* Lauber Dep. p. 77; Roberts Dec. Ex. G,
Deposition Transcript of Jeffrey Case, taken January 20, 2016 ("Case Dep."), p. 56; Roberts
Dec. Ex. E, Deposition Transcript of Ray Pabon, taken December 1, 2015 ("Pabon Dep."),
p. 51; Roberts Dec. Ex. F, Deposition Transcript of Joseph Keefe, taken December 2, 2015
("Keefe Dep."), pp. 66-67.)

**Plaintiff's Response:**

Disputed.  Initially, Defendants Lauber Case, and Pabon testified that they could not remember Plaintiff requesting a wheelchair accessible desk.  (Lauber Dep. at p. 77; Case Dep. at p. 56, Pabon Dep. at p. 50).  They did not deny that such request was made. Further, Defendant Keefe testified that Plaintiff "could have" made a request for a wheelchair accessible desk, but he could not "remember him specifically asking."  (Keefe Dep. at pp. 66-67). However, based on Plaintiff's testimony that he made such a request, an issue of fact exists as to whether Plaintiff made a request for accommodation.  (West Dec. at ¶ 17; West Dep. at pp. 94-96).

**Defendants' Statement ¶ 29:**

From 2002- 2006, when Plaintiff notified staff of issues regarding his wheelchair, said complaints were forwarded to the proper departments and plaintiff was provided with sufficient repairs. (Declaration of David Dinello MD in Support of Defendants' Motion for Summary Judgment, sworn to November 23, 2016 [Dck. No. 102-4] ("Dinello Dec."), ¶ 40).

**Plaintiff's Response:**

It is undisputed that Plaintiff notified DOCCS staff of issues relating to the maintenance of his wheelchair.  As Defendants have not demonstrated the sufficiency of the repairs to Plaintiff's wheelchair, this fact remains in dispute.  (West Dep. at pp. 43-44).

**Defendants' Statement ¶ 30:**

On October 4, 2005, the plaintiff complained about his wheelchair and was "advised [that he] could receive swap out [his ]chair but would be responsible to have own wheelchair fixed if desired."  The plaintiff did not accept the exchange and simply "wheeled out of room."  (Dinello Dec. at ¶ 41).

**Plaintiff's Response:**

Disputed.

**Defendants' Statement ¶ 31:**

On June 5, 2006, Plaintiff was offered a new wheelchair as the old one was deemed unsafe.  Plaintiff refused to accept the new wheelchair.  (Dinello Dec. at ¶ 42).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 32:**

On February 20, 2002, Plaintiff is issued a medical permit for wrist splints and provided same.  (Dinello Dec. at ¶ 8).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 33:**

On March 1, 2002, the plaintiff began his prescribed physical therapy ("PT") to address, among other things, his carpel tunnel syndrome.  (Dinello Dec. at ¶ 13).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 34:**

On March 1, 2002, Plaintiff's physical therapist recommended that the plaintiff participate in weekend sessions of wearing braces/splints, however the plaintiff refused. (Dinello Dec. at ¶ 13).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 35:**

On March 6, 13 & 15, 2002, the plaintiff refused PT against the recommendation of the physical therapist.  (Dinello Dec. at ¶ 15).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 36:**

Patient refused PT the entire week of March 18, 2002, despite the therapist's recommendations and having alerted plaintiff of the negative impact it would have on his progress.  (Dinello Dec. at ¶ 16).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 37:**

On April 2, 2002, Plaintiff refused to be evaluated, by a physiatrist for "his ambulation and ADL's and necessary equipment."  (Dinello Dec. at ¶ 21).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 38:**

On September 13, 2002, Plaintiff was issued a new right wrist splint.  (Dinello Dec. at ¶ 29).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 39:**

The medical records indicate that on December 20, 2002 and July 29, 2003, Plaintiff again refused to consent to a physiatry consult to evaluate the need for his hand splints. (Dinello Dec. at ¶ 30).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 40:**

On December 13 & 20, 2002, Plaintiff refused to accept new wrist splints.  (Dinello Dec. at ¶ 43).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 41:**

On July 29, 2003, Dr. Gregorie met with the plaintiff regarding his wrist splints and notes that "I have asked him to accept an evaluation by physical medicine physiatrist since it has been some time since last evaluation.  He insists this is not necessary and a violation of his court order, rights, etc.  My reply is that in my medical judgment, it is appropriate and medically indicated to re-evaluate his function and need.  He again refused."  Plaintiff again refused to meet with a specialist. (Dinello Dec. at ¶ 44).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 42:**

Through the remainder of 2003 and all of 2004, the plaintiff continuously refused to be evaluated by a physiatry.  (Dinello Dec. at ¶ 45).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 43:**

Plaintiff was issued a handicapped cassette player on February 26, 2002.  (Jones Dec. Ex. C, at p. 477).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 44:**

In 2006, Plaintiff filed a grievance for the denial of handicapped headphones.  (Jones Dec. at ¶ 16).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 45:**

It was determined that the headphones were denied because they contained a metal band.  Plaintiff was issued a set of headphones that were within security protocol. (Jones Dec. at ¶ 16).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 46:**

In 2002, Plaintiff complained to medical regarding a request for a wheelchair pusher. (Dinello Dec. Ex. A, at p. 4867).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 47:**

Plaintiff was informed that "pushers" are assigned to buildings and not specific individuals.  (Dinello Dec. at ¶¶ 26, 28).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 48:**

Plaintiff was provided access to the "building pusher."  (Dinello Dec. at ¶ 26).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 49:**

Plaintiff was also issued a new cell assistant.  (Dinello Dec. at ¶ 26).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 50:**

In 2003, Plaintiff filed a grievance requesting a "properly" trained cell assist. Specifically, it was noted that the plaintiff was asking his cell assistant to perform tasks, such as making the bed, which were not required of the assistant.  (Jones Dec. at ¶ 11).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 51:**

It is also noted that the plaintiff had been provided several qualified cell assists since his arrival at Five Points but was unable to "get along" any of them.  (Jones Dec. at ¶ 12).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 52:**

Despite the plaintiffs inability to "get along" with those assigned to him, a cell assist was consistently assigned and replaced when needed.  (Jones Dec. at ¶ 13).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 53:**

In 2007, Plaintiff filed a grievance and ADA request for a full-time cell assist.  Said request was granted however Plaintiff was notified that cell assists work certain MOD's, i.e. shifts, and not an entire day.  (Jones Dec. at ¶ 17).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 54:**

Plaintiff alleges that his Eighth Amendment rights were violated when he was retaliated against via the filing a fraudulent impeachment charges and subsequently removed from the IGRC.  (*See* Complaint at ¶ 29).

**Plaintiff's Response:**

Disputed.  Plaintiff's retaliation claim alleges a violation of the rights guaranteed to

him under the First Amendment.  (Complaint at ¶ 76).

**Defendants' Statement ¶ 55:**

Plaintiff began filing grievances regarding the IGRC itself in March 2002 and continued to do so during his terms of service as an IGRC alternate and representative.  (*See* Defendants' Fed. R. Civ. P. 26 Disclosures [Dck. 71], at pp. 53-54).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 56:**

In December 2002, Plaintiff was elected to serve as an alternate IGRC representative and was issued a copy of the IGRC Training Manual ("Manual") and Code of Ethics ("Code").  (*See* Roberts Dec. Ex. I, at pp. 76-77).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 57:**

Said Code, applicable to IGRC staff, inmate reps, clerks and the chairperson, provides in part "Violations of this code may result in dismissal from participation in the Grievance Program."  (Roberts Dec. Ex. I, p. 77).

**Plaintiff's Response:**

Undisputed, with clarification.  The IGRC Code of Ethics also requires that all members, including IGRC staff, "shall not obstruct an inmate from exercising his or her right to file a grievance nor ridicule an inmate or his or her grievance." (Roberts Dec. Ex. I, at p. 77).

**Defendants' Statement ¶ 58:**

In June 2003, Plaintiff was elected as an IGRC representative.  (*See* Complaint at ¶ 48).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 59:**

On July 2, 2003, during a staff meeting, Plaintiff continually disputed the meaning of Directive 4040 and the Manual and was unsusceptible to any interpretation other than his own.  (Roberts Dec. Ex. I, at p. 337).

**Plaintiff's Response:**

Disputed.  Plaintiff orally inquired about the interpretations of Directive 4040 at the July 2, 2003 IGRC staff meeting, and documented these inquiries in a memorandum sent to Defendant Henrich on the same day.  (West Dec. Ex. 4).  To the contrary, Defendant Henrich's memorandum characterizes said inquiries to be based on "his own interpretation[s]" of Directive 4040.  (Roberts Dec. Ex. I, at p. 337).  Thus, an issue of fact remains to determine whether the actions which Defendant Henrich documented as adversarial were protected under the First Amendment.

**Defendants' Statement ¶ 60:**

Plaintiff was also reminded of grievance timeliness and office confidentiality. (Roberts Dec. Ex. I, at p. 337).

**Plaintiff's Response:**

Undisputed, with clarification.  It is undisputed that the July 2, 2003 memorandum written by Defendant Henrich states that Plaintiff was reminded of grievance timeliness and office confidentiality.  (Roberts Dec. Ex. I, at p. 337). Whether Plaintiff was reminded of such items is in dispute.

**Defendants' Statement ¶ 61:**

On July 7, 2003, Plaintiff received an Informal Counseling Memorandum ("Informal") from Defendant Henrich, Inmate Grievance Supervisor.  Said memo reminded Plaintiff of the confidentiality of the information received in the grievance office and stated the plaintiff "could assist another inmate with the preparation of [his] grievance but any personal knowledge of the office was not to be incorporated in that individual's grievance". Plaintiff was also reminded of the time frames required in addressing hearings/grievances. (Roberts Dec. Ex. I, at pp. 338-339).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 62:**

On July 10, 2003, a memorandum from Defendant Henrich was written to Plaintiff's file regarding her "observations" of his performance as an IGRC representative.  In this

memorandum, Defendant Henrich outlines an instance where the plaintiff was asked by Defendant Lauber to review files for hearings to take place that day and ensure that they were complete.  (Roberts Dec. Ex. I, at pp. 340-341).

**Plaintiff's Response:**

Undisputed, with clarification.  The July 10, 2003 memorandum written by

Defendant Henrich also states that "Mr. Wess [*sic*] is attempting to create more work in the

IGRC office."  (Roberts Dec. Ex. I, at p. 341).

**Defendants' Statement ¶ 63:**

Later that day, when a hearing an inmate by the name of McTier occurred, Defendant Lauber noted that it sounded familiar and it was determined that the hearing had in fact been previously heard two days prior.  (Roberts Dec. Ex. I, at pp. 340-341).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 64:**

Defendant Lauber provided tips to the plaintiff, such as completing and mailing out responses immediately, to ensure that the mistake did not occur again.  (Roberts Dec. Ex. I, at pp. 340-341).

**Plaintiff's Response:**

Undisputed, with clarification.  The July 10, 2003 memorandum written by

Defendant Henrich states that Defendant Lauber "pointed out, if responses were done and

mailed out, such confusion would not exist."  (Roberts Dec. Ex. I, at pp. 340-341).

**Defendants' Statement ¶ 65:**

In addition to the duplication, it was noted the file did not contain a complete investigation.  (Roberts Dec. Ex. I, at pp. 340-341).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 66:**

It was noted that the Plaintiff became argumentative during the hearing and was reminded of his purpose in the program.  (Roberts Dec. Ex. I, at pp. 340-341).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 67:**

Again, during a hearing, Plaintiff tried to get a grievant to assert that he was being denied access to the general library because of his disability when the grievant simply stated that he wanted more time in the general library.  (Roberts Dec. Ex. I, at pp. 340-341).

**Plaintiff's Response:**

Undisputed with clarification.  The July 10, 2003 memorandum written by

Defendant Henrich states that "Mr. Wess [*sic*] became argumentative during the hearing

and was reminded his purpose . . . ."  (Roberts Dec. Ex. I, at pp. 340-341).

**Defendants' Statement ¶ 68:**

It was noted that the plaintiff frequently requested extensions but does not seem to work on the files and that he continues to read more into grievances than what the grievance states.  (Roberts Dec. Ex. I, at pp. 340-341).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 69:**

On July 23, 2003, Defendants Henrich and Lauber spoke with the plaintiff his disruptive behavior, advising him of the purpose of the IGRC and the importance of timeliness.  Plaintiff was issued a copy of proposed Job Duties which in part reminded the plaintiff to abide by the IGRC Code of Ethics.  (Roberts. Dec. Ex. I, at pp. 343-345).

**Plaintiff's Response:**

Undisputed with clarification.  The July 23, 2003 memorandum written by

Defendant Henrich states that Defendants Henrich and Lauber spoke with Plaintiff about

his behavior during IGRC hearings, and advised him of his purpose and responsibilities on

the IGRC.  (Roberts Dec. Ex. I, at pp. 343-345).  Whether the conversation took place is in

dispute.

**Defendants' Statement ¶ 70:**

On July 24, 2003, the plaintiff attempted to proceed with a grievance even though
the grievance was completed.  (Roberts Dec. Ex. I, at pp. 346).

**Plaintiff's Response:**

Undisputed with clarification.  The July 24, 2003 memorandum written by

Defendant Henrich states that Plaintiff attempted to instruct an inmate not to "sign off on a

grievance."  (Roberts Dec. Ex. I, at pp. 346).

**Defendants' Statement ¶ 71:**

He also attempted to read from the IGRC Training Manual during the hearing and
was advised not to do so.  (Roberts Dec. Ex. I, at pp. 346).

**Plaintiff's Response:**

Undisputed with clarification.  The July 24, 2003 memorandum written by

Defendant Henrich states that Plaintiff attempted to read from the IGRC Training Manual

during the hearing and was advised not to do so.  (Roberts Dec. Ex. I, at pp. 346).

**Defendants' Statement ¶ 72:**

Plaintiff was also observed providing inmates with partial information regarding the
signing off of a grievance; informing them that if they did sign a grievance they would not
be able effectuate their right to file an Article 78.  Defendant Henrich noted that this is true
only in some instances, i.e. not when the grievance is about a non-grievable issue, which she
attempted to explain to the plaintiff.  She further notes that the plaintiff is "undermining the
IGRC by either telling an inmate not to sign off on a grievance, or in some way with a nod
of the head not to sign off."  (Roberts Dec. Ex. I, at pp. 346).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 73:**

On July 25, 2003, Plaintiff received a Formal counseling notification ("Formal") when he was observed reviewing a large group of grievances and it was determined that said grievances were not those scheduled for the day but in fact were informal grievances that were already completed on July 16th.  (Roberts Dec. Ex. I, at pp. 347-363).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 74:**

It was further determined that the plaintiff had improperly filed the grievances and therefore many of them would be considered untimely.  (Roberts Dec. Ex. I, at pp. 347-363).

**Plaintiff's Response:**

Undisputed with clarification.  The July 25, 2003 Formal Counseling Memorandum

("Formal") states that Plaintiff placed the grievances filed by other inmates "in a file drawer

and not where they belong.  Most of these grievances if not all will be untimely."  (Roberts

Dec. Ex. I, at p. 347).

**Defendants' Statement ¶ 75:**

On August 1, 2003, Plaintiff was issued a Formal Counseling memo regarding his continued failure to thoroughly conduct and complete grievance investigations.  (Roberts Dec. Ex. I, at p. 336).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 76:**

In a September 3, 2003 Formal Counseling Memorandum, it was noted that Plaintiff should fully review folders prior to formal hearings to ensure that all documentation are present in the grievance file prior to the hearing and to advise, if there were incomplete files. Plaintiff was noted as to having provided incomplete files of a particular inmate and did not provide all of the pertinent CORC documentation.  (Roberts Dec. Ex. I, at pp. 78-79).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 77:**

On September 11, 2003, Plaintiff was issued a Formal for inappropriate behavior during a hearing held on September 9th.  Plaintiff provided incorrect information to a grievant regarding the confidentiality of his medical health and resulted in said inmate divulging irrelevant medical information.  (Roberts Dec. Ex. I, at p. 85).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 78:**

In two memorandums dated October 2 and October 7, 2003, Defendant Henrich noted discussions with the plaintiff regarding his continuous issues regarding coding.  These memorandums note that the plaintiff continues to question how grievances are coded and particularly does so in front the grievant.  (Roberts Dec. Ex. I, at pp. 87-a, 87).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 79:**

In her October 7th memorandum, Defendant Henrich made it clear that it's her role to code and title the grievances and that its Plaintiffs role to do an informal investigation. She also noted that the plaintiff "continues [to have] an adversarial demeanor."  (Roberts Dec. Ex. I, at p. 87).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 80:**

On October 21, 2003, Plaintiff was served with impeachment recommendation and notification of an impending hearing.  (Roberts Dec. Ex. I, at pp. 71-75, 78-79, 85, 87, 338-341, 346-347, 87-a).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 81:**

In her recommendation for impeachment, Defendant Henrich stated that Plaintiff used the inmate grievance process as an "adversary process," which is contrary to the goals

of the program which are to promote mediation and conflict resolution.  She further stated that the plaintiff maintains an adversarial demeanor and failed to follow staff direction. (Roberts Dec. Ex. I, at p. 73).

**Plaintiff's Response:**

    Undisputed.

**Defendants' Statement ¶ 82:**

    On October 28, 2003, the impeachment hearing began with Defendant Napoli acting as the hearing officer and ran for several days.  The outcome of the hearing was Plaintiff's removal from his position as IGRC representative for a three year period.  (Roberts Dec. Ex. I, at pp. 69, 105).

**Plaintiff's Response:**

    Undisputed.

**Defendants' Statement ¶ 83:**

    Plaintiff signed for a copy of the determination on November 17, 2003.  In the determination, it was noted that the plaintiff provided "no real defense to the charges." (Roberts Dec. Ex. I, at pp. 69-70).

**Plaintiff's Response:**

    Undisputed.

**Defendants' Statement ¶ 84:**

    There was testimony at the hearing that Plaintiff was adversarial and failed to follow staff direction.  (Roberts Dec. Ex. I, at pp. 69-70).

**Plaintiff's Response:**

    Undisputed.

**Defendants' Statement ¶ 85:**

    Plaintiff was found to specifically have broken rules B, E, F and G of the IGRC Code of Ethics.  (Roberts Dec. Ex. I, at pp. 69-70).

**Plaintiff's Response:**

    Undisputed.

**Defendants' Statement ¶ 86:**

Plaintiff repeatedly harassed and threatened members of the IGRC staff.  (*See* West Dep. at pp. 59, 100, 108-109, 115-117).

**Plaintiff's Response:**

Disputed.  Defendants mischaracterize Plaintiff's testimony to conclude that his

conduct and demeanor toward DOCCS staff rose to the level of harassment or contained

threats.  To the contrary, Plaintiff was notifying IGRC staff of the discriminatory conduct

present in the IGP office.  (West Dep. at pp. 58-59).

**Defendants' Statement ¶ 87:**

Plaintiff testified that he told Defendant Pabon to "get some balls" on several occasions.  (West Dep. at pp. 100, 108, 117).

**Plaintiff's Response:**

Undisputed, with clarification.  Plaintiff explained that his statements to Defendant

Pabon to "get some balls" referred to the fact that there was an Order from the United States

District Court for the Southern District of New York that stated that he was to be provided

with certain medical items ("Conditional Discharge Order") (West Dec. Ex 14), and that

Defendant Pabon should provide them in accordance with said Conditional Discharge

Order.  (West Dep. at pp. 100-101).

**Defendants' Statement ¶ 88:**

Plaintiff testified that he told Defendant Case "Either get rid of it or there's going to be a problem."  (West Dep. at p. 59).

**Plaintiff's Response:**

Undisputed, with clarification.  The full statement made by Plaintiff to Defendant

Case was, "You have a racial component in the grievance office, you know, and you can

either get rid of it, or there's going to be a problem."  (West Dep. at p. 59).  Further, Plaintiff

explained that the statement to Defendant Case was made with respect to the IGRC's

practice of "tampering with the ballots" to keep white and Hispanic inmates as IGRC

representatives.  (West Dep. at pp. 58-60).

**Defendants' Statement ¶ 89:**

Plaintiff made repeated threats of filing suit against Defendants.  (West Dep. at pp.
108-109).

**Plaintiff's Response:**

Undisputed, with clarification.  Plaintiff explained that he threatened to commence

legal action against DOCCS staff when he was compelled to vote in opposition to grievance

precedent.  (West Dep. at pp. 108-109).

**Defendants' Statement ¶ 90:**

Plaintiff testified that he told Defendant Keefe "you can't act like sensitive hooker".
(West Dep. at pp. 115-17).

**Plaintiff's Response:**

Undisputed, with clarification.  Plaintiff explained that he used the term in jest, to

state that Defendant Keefe should "stop being sensitive" about providing him medical care

in compliance with the Conditional Discharge Order.  (West Dep. at p. 116).

**Defendants' Statement ¶ 91:**

Plaintiff made a habit of deadlocking IGRC hearing votes and refusing to hold
hearings.  (West Dep. at pp. 70, 73, 88, 90, 91).

**Plaintiff's Response:**

Disputed.  Plaintiff testified that when his vote on a grievance cased a deadlock,

Defendants made the accusation that his vote was for the sole purpose of being adversarial.

(West Dec. at ¶ 26).  As Plaintiff's participation and voting on the IGRC is a protected

activity, issues of fact remain as to whether his removal for "deadlocking" grievance votes

was made in retaliation to his engaging in protected activity.

**Defendants' Statement ¶ 92:**

Defendants Henrich and Lauber never voiced any feeling of displeasure about the plaintiff for filing grievances against the IGRC.  (Keefe Dep. at p. 70).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 93:**

Lots of inmates filed a large amount of grievances, specifically against the IGRC its self.  (Keefe Dep. at p. 70; Lauber Dep. at pp. 88, 93-94).

**Plaintiff's Response:**

Undisputed, with clarification.  Defendant Lauber testified, "I've answered a lot of

grievances."  (Lauber Dep. at p. 88).  The generalization that "Lots of inmates filed a large

amount of grievances. . ." is an overstatement of Defendant Lauber's testimony.  (Statement

at ¶ 93).

**Defendants' Statement ¶ 94:**

The IGRC office contained a table, desks and unattached chairs.  (Lauber Dep. at p. 48).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 95:**

The tables and desks were used by all IGRC staff and representatives to conduct their duties.  (Lauber Dep. at p. 48).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 96:**

There was no assigned seating as such Plaintiff was free to work at either a desk or table.  (Lauber Dep. at p. 50).

**Plaintiff's Response:**

Undisputed with respect to the fact that there was no assigned seating in the IGP office.  Disputed with respect to the statement that "Plaintiff was free to work at either a desk or table," because Plaintiff's wheelchair could not fit at a desk that was not designed to accommodate a wheelchair.  (West Dep. at p. 95).

**Defendants' Statement ¶ 97:**

Thus there were a variety of accessible work spaces available to Plaintiff at which he could have worked.  (Lauber Dep. at p. 50).

**Plaintiff's Response:**

Disputed.  Plaintiff did not have accessible work spaces based on Defendants' failure to accommodate his request for a wheelchair accessible desk.  (West Dep. at pp. 94-96).  Thus, there remains an issue of fact to determine whether the available work spaces were wheelchair accessible.

**Defendants' Statement ¶ 98:**

Prior to the start of Plaintiff's term as an IGRC rep, African American, Caucasian and Latino inmates had served in the position.  (West Dep. at p. 47, Complaint at ¶ 48).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 99:**

Said prior representatives were permitted access to the facility to conduct IGRC investigations.  (Lauber Dep. at p. 17).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 100:**

Defendant Lauber testified that the rule allowing IGRC reps to move freely about the facility to conduct IGRC business was in place for a brief period of time and was suspended shortly after she began her bid in the IGRC office in 2002.  (Lauber Dep. at p. 17-18, 39).

**Plaintiff's Response:**

Undisputed, with clarification.  Defendant Lauber testified that the rule changed

shortly after she bid in the IGRC, but Plaintiff has testified that the rule changed after his

election to the IGRC.  (West Dec. at ¶¶12-14, 18-20).

**Defendants' Statement ¶ 101:**

Plaintiff began his term as an IGRC rep. in June 2003, several months after the rule change occurred in 2002.  (Complaint at ¶ 48).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 102:**

Defendant Lauber testified that she was not responsible for the rule change.  (Lauber Dep. at p. 81).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 103:**

Defendant Lauber testified that she believes the policy change was put in place because Five Points is designated a "maximum security" prison and as allowing such movement passes would be difficult because the rep would need to be escorted, there are only certain times when the reps would be able to travel and it is not permitted for inmates to be in housing units to which they are not assigned.  (Lauber Dep. at p. 39:14-20).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 104:**

Defendant Lauber further testified that she could not recall an incident of personally having escorted an inmate to conduct IGRC investigations.  (Lauber Dep. at p. 82).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 105:**

Defendants Case and Pabon also denied ever escorting an inmate to conduct IGRC investigations.  (*See* Case Dep. at p. 45; Pabon Dep. at p. 51).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 106:**

Plaintiff alleges that Defendants Goord, Poole, Eagen, Dennis, Bernardi, Leclaire and Henrich conspired to prevent him from having access to move about the facility freely to conduct IGRC business due to his race.  (*See* Complaint at ¶ 55-57).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 107:**

Plaintiff further alleges that Defendants Eagen, Poole, Dennis, Napoli, Case and Lauber conspired to have him removed from the IGRC with false impeachment charges. (Complaint at ¶ 137-161).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 108:**

In support of his allegations, Plaintiff presented one letter written to Defendant Goord, and copied to Defendants Leclaire and Bernardi, and three other letters, none of which are addressed to any of the defendants, regarding his displeasure with how the IGRC program is being run.  (*See* Dck. No. 29-3, p. 7-8, 13-16).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 109:**

When asked directly what proof he possessed that the alleged conspiracies took place, Plaintiff provided simply stated it was because he had filed several grievances against the Defendants regarding the alleged constitutional violations.  (*See* West Dep. at pp. 19-23, 153).

**Plaintiff's Response:**

Disputed.  In response to questioning about the evidence of a conspiracy, Plaintiff stated that because he had filed grievances against the IGRC, and notified supervisory staff of the improprieties within the IGRC, such that the supervisory Defendants were reasonably on notice and involved in the conspiracy.  (West Dep. at p. 23).  Moreover, as evidence of a conspiracy, Defendant Lauber admitted that she "probably" spoke to Defendant Henrich about the decision to impeach Plaintiff from the IGRC.  (Lauber Dep. at pp. 101-102).  Thus, an issue of fact remains as to whether Defendants engaged in a conspiracy.

**Defendants' Statement ¶ 110:**

Notably, said grievances were investigated by none members of the IGRC, none of whom are defendants in this matter, and upheld by CORC.  (*See* Complaint ¶ 34, Dck. Nos. 29-2; 29-3, at p. 1-3).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 111:**

Plaintiff alleges that his Eighth Amendment rights were violated when he was denied proper medical care when he was not provided adequate wheelchair maintenance, hand/wrist splints and, in 2002, a sufficient supply of and/or proper catheters.  (*See* Complaint at ¶ 43-45).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 112:**

Records indicate that on February 20, 2002, Plaintiff was to receive 3 catheters per week, along with swab sticks and gloves.  Dinello Dec. at ¶ 8.

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 113:**

On February 27, 2002, the patient was issued 21 catheters.  Dinello Dec. at ¶ 10.

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 114:**

On February 27, 2002, per Plaintiffs request, he was issued 2 additional catheters. Dinello Dec. at ¶ 11.

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 115:**

From March 6- 20, 2002, Plaintiff was issued 7 catheters per week.  Dinello Dec. at ¶ 12.

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 116:**

Beginning March 27, 2002, the plaintiff was issued 28 catheters per week.  (Dinello Dec. at ¶ 19).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 117:**

On April 4, 2002, Plaintiffs medical permit was changed to include the following: 4 catheters per day issued weekly, chux, surgilube and instructions regarding using the catheter.  (Dinello Dec. at ¶ 22).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 118:**

Beginning June 20, 2002, the plaintiff was issued 4 catheters per day on a daily basis. (Dinello Dec. at ¶ 25).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 119:**

On December 2, 2002, Plaintiff was issued a 12 day supply of catheters.  (Dinello Dec. at ¶ 31).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 120:**

When directly what his injuries were, Plaintiff stated:

They exacerbated my medical problems that I came here under, in the conditional discharge order for James West.  All right?  They were supposed to give me appropriate catheters - a supply of catheters.  They didn't ....  At times, they gave me catheters that I wasn't supposed to have that caused me pain and suffering, that medically messed me up.  And at times, I couldn't breathe, you know ...  They exacerbated the medical problems with my hands, that made my nerves in my hands worser.

(West Dep. at pp. 200, 202).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 121:**

Plaintiff testified that he experienced an enlarged scrotum resulting from a urinary tract infection ("UTI") due to Defendants' failure to provide an adequate supply of catheters.  (*See* West Dep. at pp. 33:17-34:12).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 122:**

On December 8, 2002, Plaintiff complained of not being able to urinate.  The nurse on duty offered him a bed in the infirmary, which he refused.  The patient was provided Tylenol for his discomfort and a urine specimen container.  The AHR is noted for followed-up with PA Macomber.  (Dinello Dec. at ¶ 32).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 123:**

Later that day, Plaintiff returned the urine sample to medical and again was offered a bed in the infirmary, which he refused.  The patient also refused Tylenol.  (Dinello Dec. at ¶ 33).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 124:**

On December 9, 2002, it was noted that blood in the patient's urine sample was likely due to his self-catheterization technique.  A urine analysis ("U/A") is ordered. (Dinello Dec. at ¶ 34).

**Plaintiff's Response:**

Undisputed, with clarification.  Contrary to the DOCCS medical notes, Plaintiff

testified that the blood in his urine was not due to his self-catheterization technique.  (West

Dec. at ¶ 49).

**Defendants' Statement ¶ 125:**

On December 11, 2002, the plaintiff complained of testicular discomfort.  The AHR indicates that the patients "right testicle [was] about 4x larger than the left [and was] hard and tender".  Plaintiff was given Tylenol for the discomfort and scheduled to meet with the doctor on 12/13/2002.  (Dinello Dec. at ¶ 35).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 126:**

On December 12, 2002, the plaintiff reported to medical with complaints of back pain but denied any scrotal discomfort.  Plaintiff requested and received a catheter to self-catheterize.  Plaintiff met PA Macomber and stated "he feels fine".  PA Macomber notes that the plaintiffs scrotum "demonstrates a 2x3 cm mass is firm and non-mobile".  PA Macomber further notes that the U/A is pending to rule out a urinary tract infection ("UTI") and orders a sonogram of the testes.  (Dinello Dec. at ¶ 36).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 127:**

The U/A laboratory results confirm that no UTI was present.  (Dinello Dec. at ¶ 37).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 128:**

On December 13, 2002, Plaintiff was again seen in medical and the AHR notes the right testicle is large but it is a "non-painful area."  (Dinello Dec. at ¶ 38).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 129:**

The defendants in this matter are not DOCCS medical professionals and as such were not involved in the medical treatment provided to the plaintiff.  (Dinello Dec. at ¶ 46).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 130:**

Defendant Dennis has no recollection and/or knowledge of the Plaintiff or his allegations.  (Declaration of Julie Dennis in Support of Defendants' Motion for Summary Judgment, sworn to November 28, 2016 ("Dennis Dec."), at ¶ 7).

**Plaintiff's Response:**

Undisputed.

**Defendants' Statement ¶ 131:**

Defendant Dennis is not involved in grievances or complaints at the facility level. (Dennis Dec. at ¶ 8).

**Plaintiff's Response:**

Undisputed.

### C.     Genuine issues of material fact preclude Defendants' entitlement to summary judgment

In order to establish their entitlement to summary judgment, Defendants must demonstrate, among other things, that there are no genuine issues of material fact.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying [the evidence] which it believes demonstrate the absence of a genuine issue of material fact").  Pursuant to Local Rule 56(a)(2), Plaintiff reincorporates the disputed facts fully analyzed in Point B, and submits the following statement of material facts that remain in dispute, and must be resolved by the trier of fact:

1.     The record does not demonstrate that Defendants served the Suggestion of Death, dated May 18, 2016 [Dck. No. 90], upon Defendant Henrich's estate or representative.  Thus, an issue of fact remains as to whether Defendant Henrich's estate or representative were served with the Suggestion of Death, such that the claims should be dismissed against Defendant Henrich.

2.     Plaintiff's impeachment from the IGRC was causally related to his to his engaging in the protected action of filing grievances and participation on the IGRC.  (West Dec. at ¶¶ 27, 28, 30, 32; West Dec. Exs. 5-6).  Defendants contend that the Plaintiff's behavior and incomplete work product, and attempts to undermine the IGRC, provided a basis for his dismissal from the IGRC.  (Roberts Dec. Ex. I, at pp. 78-79, 82-85).  Thus, an

issue of fact remains as to whether Plaintiff's impeachment was the product of retaliation against Plaintiff for engaging in a protected action.

3.      Defendants further allege that Plaintiff was impeached from the IGRC because of, *inter alia*, his inability to complete his work in a timely manner.  (Roberts Dec. Ex. I).  However, Plaintiff's inability to complete the work was the result of Defendants' refusal to accommodate his disability by providing a wheelchair accessible desk.  (West Dec. at ¶ 22).  Thus, an issue of fact remains as to whether Plaintiff could have completed his work with proper accommodation.

4.      Before Plaintiff's election to the IGRC, inmate representatives were allowed to remain in the IGP office during routine inmate counts to complete additional work. (West Dec. at ¶ 18).  Upon Plaintiff's election to the IGRC, he was required to travel back to his housing units for count, which took additional time compared to ambulatory inmates. (West Dec. at ¶ 19).  Plaintiff requested accommodation, which was denied.  (West Dec. at ¶ 20).  Defendant Lauber testified that an inmate representative sometimes stayed in the IGP office during the lunch break.  (Lauber Dep. at p. 83).  Thus, an issue of fact remains as to whether Defendant was denied accommodation to remain in the IGP office during the lunch break.

5.      Plaintiff has been bound to a wheelchair at all times since transferring to the custody of Five Points.  (West Dec. at ¶ 7).  Thus, an issue of fact remains as to whether Defendants should have reasonably known, even without a formal request, that he needed accommodation in the IGP office for the purposes of Plaintiff's claims.

6.      Based on the treatment of, and privileges afforded to, white and Hispanic IGRC inmate representatives prior to Plaintiff's election to the IGRC, an issue of fact

remains as to whether Plaintiff was discriminated against based on his African-American race.  (West Dec. at ¶¶ 12, 14).

7.      Defendant Napoli made the sole determination of the material knowledge of the witnesses that Plaintiff intended to call at his impeachment hearing.  (West Dec. at ¶¶ 34-35).  This determination demonstrated the inherent bias of Defendant Napoli, such that a material fact remains as to whether Plaintiff was denied a right to an impartial tribunal in his impeachment hearing.

8.      The Conditional Discharge Order required DOCCS officials to, among other things, provide Plaintiff with "an adequate supply of urinary catheters in his cell."  (West Dec. Ex. 14).  In 2002, he was provided with catheters on a sporadic basis in varying amounts that were insufficient for use as intended.  (West Dec. at ¶¶ 44, 46).  Additionally, DOCCS failed to provide the necessary equipment to properly clean the catheters.  (West Dec. at ¶ 47).  Defendants contend that medical treatment received by Plaintiff was "consistent with the prevailing standards of medical care."  (Dinello Dec. at ¶ 47).  Thus, an issue of fact remains as to whether the amount of catheters supplied to Plaintiff was "adequate" as contemplated by the Conditional Discharge Order.

Dated:  Buffalo, New York
   January 30, 2017

       PHILLIPS LYTLE LLP


       By: /s/ Amanda L. Lowe
         Amanda L. Lowe
         Daniel R. Maguire
         Patrick M. Hanley, Jr.
         Attorneys for Plaintiff
       *James West*
       One Canalside
       125 Main Street
       Buffalo, New York 14203-2887
       Telephone No. (716) 847-8400
       alowe@phillipslytle.com
       dmaguire@phillipslytle.com
       phanleyjr@phillipslytle.com

Doc #01-3011974