UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JAMES A. WEST A/K/A WESS,

                                        Plaintiff,

                                                        05-CV-447-FPG
                                                        DECISION AND ORDER

v.

GLENN S. GOORD, STEPHAN BERNARDI,
THOMAS POOLE, THOMAS EAGEN
JANICE HENRICH, LISA LAUBER
DAVID NAPOLI, DONALD SELSKY,
LUCIEN LECLAIRE, SGT. CASE,
SGT. PABON, SGT. O`KEEFE, and
C.O. L. LAUBER,

                                        Defendants.
_____

## INTRODUCTION

Plaintiff James West a/k/a James Wess ("Plaintiff"), commenced this action alleging

violations of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act

("Rehabilitation Act"), and various federal Constitutional rights pursuant to 42 U.S.C. § 1983.

ECF. No. 29 ("2d Am. Compl.").

Currently pending before the Court is the Defendants' Motion for Summary Judgment.

ECF No. 102. Having considered the moving papers, the record evidence and the applicable law,

the Court finds oral argument unnecessary and for the following reasons, Defendants' summary

judgment motion is granted in part and denied in part.

Plaintiff is an inmate in the New York State Department of Corrections and Community Supervision ("DOCCS"), and is currently housed at Five Points Correctional Facility ("Five Points"). At all times relevant to Plaintiff's claims, he has been wheelchair-bound and suffers from a host of medical issues.

Plaintiff's Second Amended Complaint alleges: (1) violations of his Eighth Amendment rights when he was denied adequate wheel chair maintenance, hand and wrist splints, and a sufficient supply of proper catheters; (2) denial of his due process rights under the Fourteenth Amendment during impeachment proceedings; (3) withholding of reasonable accommodations and medical equipment under the ADA and Section 504; (4) racial discrimination in violation of the Equal Protection Clause; and (5) various retaliatory actions taken by Defendants in violation of his First Amendment rights. 2d Am. Compl., ¶¶ 76, 78, 85-86, 102, 104, 119, 121, 136, 146, 180-85, 187. Plaintiff also advances an overarching conspiracy claim in violation of 42 U.S.C. §§ 1985(3) and 1986. *Id.*, ¶ 186.

Defendants are or were all employees of DOCCS. Defendants Case, Henrich, Keefe, Lauber, Napoli, Pabon, and Poole were assigned to Five Points. All Defendants, with the exception of Deputy Commissioner of Policy & Compliance Stephan Bernardi, are sued in their individual capacities only.

---

[1]     The following material facts, drawn from the parties' Local Civil Rule 56 Statements and evidentiary submissions, are undisputed unless otherwise noted.

I.      The Inmate Grievance Resolution Committee ("IGRC")[2]

        A.      *Plaintiff's Involvement and Impeachment*

In June 2003, Plaintiff was elected as an IGRC representative. In connection with his election to serve as an alternate IGRC representative, Plaintiff received a copy of the Inmate Grievance Program ("IGP") Manual, and signed and agreed to the IGRC Code of Ethics. The Code, applicable to IGRC staff, inmate representatives, clerks, and its chairperson, provides that violations thereof may result in dismissal from participation in the grievance program.

During a staff meeting on July 2, 2003, Defendant Henrich, Inmate Grievance Supervisor, noted that Plaintiff was "continually disputing the meaning of parts of Directive 4040 and the training manual." ECF No. 114-6 ("Def. Ex. I") at 337[3]. Plaintiff states that he was "inquiring about the interpretations of Directive 4040." ECF No. 110 ("West Decl."), Ex. 4. In the same memorandum, Henrich noted that "timeliness was addressed," and that Plaintiff was reminded that he "signed a Code of Ethics . . . what transpires in the office is to stay in the office." *Id.* Plaintiff disputes that he was "reminded." ECF No. 109 ("Pl. Opp'n Stmt."), ¶ 60.

On July 7, 2003, Plaintiff received an Informal Counseling Memorandum from Defendant Henrich, which advised Plaintiff of the confidentiality of the information received in the grievance office, and stated that Plaintiff could assist inmates with grievance preparation without incorporating any personal knowledge of the grievance office. Plaintiff was also reminded of the time frames required in addressing hearings and grievances.

---

[2]      DOCCS Directive #4040 sets forth the policy for inmate grievances, providing each inmate with "an orderly, fair, simple and expeditious method for resolving grievances . . . and allegations of discriminatory treatment . . . ." 7 N.Y.C.R.R. § 701.1 Each facility has an Inmate Grievance Review Committee, a five-member body consisting of two inmates with voting rights, two voting staff members, and a non-voting chairperson. *Id.*, § 701.4. Inmate representatives are elected by their peers and serve for terms of six months.

[3]      Page references in exhibits refer to the bates numbers on the documents.

A July 10, 2003 memorandum written to Plaintiff's file by Defendant Henrich stated her observations of Plaintiff's performance as an IGRC representative. She noted that Plaintiff "needed to be more careful with the files," on the basis that a duplicate hearing had been conducted without a complete investigation. Def. Ex. I at 340-41. The memorandum further noted that Plaintiff "continue[d] to read more into a grievance that is stated . . . attempting to create more work in the IGRC office." *Id.* On multiple occasions, Plaintiff's vote on a grievance would result in a deadlock.

On July 23, 2003, the informational notes from Plaintiff's Informal Counseling Memorandum indicated that Plaintiff and another individual were disruptive to the IGRC office. The notes stated that Plaintiff was reminded of the purpose of the IGRC and the importance of timeliness, and that Plaintiff was issued a copy of his proposed job duties. Def. Ex. I at 343-45. Plaintiff disputes that any conversation took place regarding disruptions and responsibilities. Pl. Opp'n Stmt., ¶ 69. The following day, Defendant Henrich observed that Plaintiff "attempted to force things out of control," and was "undermining the IGRC . . . ." Def. Ex. I at 346. For example, Plaintiff was observed providing inmates with partial information. *Id.*

On July 25, 2003, Plaintiff received an Inmate Counseling Notification for poor program/work performance when Plaintiff was observed reviewing a large group of grievances from a week prior that had potentially become untimely due to Plaintiff's improper filing.

On August 1, 2003, Plaintiff was issued a Formal Counseling Memorandum regarding his continued failure to thoroughly conduct and complete grievance investigations. A subsequent Formal Counseling Memorandum dated September 3, 2003, noted that Plaintiff should fully review folders prior to formal hearings to ensure that all documentation is present in the grievance file, and to advise if there were incomplete files. Plaintiff was requested to provide all information available to provide a complete investigation whether refuting or substantiating a grievant's claim.

Plaintiff was issued another Formal Counseling Memorandum on September 11, 2003, for inappropriate behavior during a hearing held on September 9, 2003. During that hearing, Plaintiff provided incorrect information to a grievant regarding the confidentiality of his medical health, resulting in the disclosure of irrelevant medical information.

In two memoranda dated October 2, 2003 and October 7, 2003, Defendant Henrich noted Plaintiff's continued issues with improper coding of grievances and adversarial demeanor.

Plaintiff testified that he told Defendant Case at some point that "[y]ou have a racial component in the grievance office . . . and you can either get rid of it, or there's going to be a problem." ECF No. 114-5 ("Def. Ex. H") at 59. He stated that he asked Defendant Pabon "why don't you just act like you got balls?" *Id.* at 100. Plaintiff further testified that he told the IGRC defendants that he would "eventually" sue them for "denying [him] well-established law" and for discrimination. *Id.* at 108-09. Finally, according to Plaintiff, "in a joking sense," he called Defendant Keefe a "sensitive hooker." *Id.* at 116-17.

Defendants Henrich and Lauber never voiced any feeling of displeasure about Plaintiff for filing grievances against the IGRC. Defendant Lauber testified that she "answered a lot of grievances," and that Plaintiff's filings "did not stand out in any way." ECF No. 114-1 ("Def. Ex. D") at 88.

Plaintiff was served with a Recommendation for Impeachment and hearing notification on October 21, 2003, in which he was alleged to have breached IGRC confidentiality, improperly safeguarded grievance files, and undermined IGRC's operation and credibility. Def. Ex. I at 69-72, 74-75. In her recommendation for impeachment, Defendant Henrich stated that Plaintiff used the inmate grievances process as an "adversary process," contrary to the goals of the program

which were to promote mediation and conflict resolution. *Id.* She further alleged that Plaintiff failed to follow staff direction.

Plaintiff's impeachment hearing began on October 28, 2013, during which testimony was heard from 25 witnesses over the course of several days. Defendant Napoli served as the hearing officer.

Four of Plaintiff's requested inmate witnesses refused to testify. Another inmate witness was no longer housed at Five Points, and Plaintiff concedes that the inmate had no knowledge of the incidents surrounding Plaintiff's charges. Plaintiff was denied his request to call various Commissioners and Superintendents who were located in the DOCCS Central Office on the basis that they were immaterial and lacked direct knowledge of the issues raised in the impeachment hearing.[4]

The hearing resulted in Plaintiff's removal from his position as IGRC representative for a three-year period. He signed a copy of the determination on November 17, 2003, which indicated that Plaintiff provided "no real defense to the charges," and noted that the evidence showed that Plaintiff was adversarial and failed to follow staff direction. Def. Ex. I at 69-70. Specifically, Plaintiff was in violation of Rules B, E, F, and G of the IGRC Code of Ethics.[5]

Plaintiff began filing grievances regarding the IGRC in March of 2002 and continued to do so throughout the entire course of his service as an inmate representative, which ended in the fall of 2003. On April 18, 2003, he wrote a letter to Defendant Goord and copied to Defendants

---

[4] Although Plaintiff testified that his request to call inmates Campbell, Divine, Hauk, Lashley, and Millard was denied, the record shows that inmate Campbell did testify at his hearing and the others were not listed as potential witnesses by Plaintiff.

[5] The Code provides, in relevant part, that "a willing and tactful attitude is required," "members shall not disclose information of a confidential nature," "members shall be responsible for safekeeping grievance files," and that "no member . . . shall intentionally undermine the IGRC's operation or credibility." Def. Ex. I at 101.

Bernardi and Leclaire regarding multiple violations of Directive #4040, the IGRC Training Manual, and the DOCCS Employee Manual, as well as other misconduct. Plaintiff also testified that he had filed grievances against the IGRC, and notified supervisory staff of the improprieties of the IGRC. Def. Ex. H at 23. Those grievances were investigated by members of the IGRC, none of whom are named Defendants in this case. The matter was upheld by the Central Office Review Committee.

### B. Facility Access

Prior to the start of Plaintiff's term as an IGRC representative, African-American, Caucasian, and Latino inmates had served in the position. At that time, inmate representatives were permitted access to the entire Five Points facility to conduct IGRC investigations.

The previous rule permitting IGRC representatives to move freely about the facility to conduct IGRC investigations was suspended sometime in 2002, before Plaintiff's IGRC term began in June of 2003. Defendant Lauber testified that she was not responsible for the rule change, and she believed the policy change was due to Five Points being a maximum security facility. As such, allowing unrestricted movement passes would be difficult, in that inmate representatives would need to be escorted, and because inmates were not permitted to be in housing units to which they were not assigned. She could not recall having personally escorted an inmate to conduct an IGRC investigation. Likewise, Defendants Case and Pabon denied ever escorting an inmate to conduct IGRC investigations.

Plaintiff, on the other hand, claims that Defendants Bernardi, Dennis, Eagen, Goord, Henrich, Leclaire, and Poole conspired to prevent him from having access to move freely about the facility to conduct IGRC business on the basis of his race.

## II. Plaintiff's Medical Care and Accommodation Requests

## A. Wheelchair

The IGRC office contained a table, desks, and unattached chairs, used by all IGRC staff and representatives to conduct their duties. There was no assigned seating in the IGP office. Although a table was available for Plaintiff to work at, he contends there was no wheelchair-accessible desk available. Def. Ex. H at 95. Plaintiff testified that he verbally requested a wheelchair-accessible desk for the IGP office, and no action was taken in response. *Id.* at 94-96. Defendants Case, Keefe, Lauber, and Pabon could not recall whether any such request was received.

From 2002 to 2006, Plaintiff notified staff of issues regarding his wheelchair. Those complaints were forwarded to the proper departments, but Plaintiff disputes the sufficiency of the repairs made to his wheelchair during that time. Def. Ex. H at 43-44.

On October 4, 2005, Plaintiff complained about his wheelchair, and was advised that he could swap his wheelchair with another, but would be responsible for repairing his current wheelchair.

On June 5, 2006, Plaintiff was offered a new wheelchair, as the old one was deemed unsafe. Plaintiff refused to accept the new wheelchair.

## B. Catheters

Records indicate that on February 20, 2002, Plaintiff was to receive three catheters per week, along with swab sticks and gloves. On February 27, 2002, Plaintiff was issued 21 catheters. The same day, Plaintiff was issued two additional catheters upon his request.

From March 6, 2002, through March 20, 2002, Plaintiff was issued seven catheters per week. Beginning March 27, 2002, Plaintiff was issued 28 catheters per week.

On April 4, 2002, Plaintiff's medical permit was changed to include the following: four catheters per day (issued weekly), disposable underpads, surgical lubricant, and instructions for usage. Beginning June 20, 2002, Plaintiff was issued four catheters per day on a daily basis. On December 2, 2002, Plaintiff was issued a 12-day supply of catheters.

Regarding his alleged injuries, Plaintiff testified that:

> They exacerbated my medical problems that I came here under, in the conditional discharge order for James West . . . . They were supposed to give me appropriate catheters – a supply of catheters. They didn't . . . At times, they gave me catheters that I wasn't supposed to have that caused me pain and suffering, medically messed me up. And at times, I couldn't breathe . . . .

Def. Ex. H at 200.

Plaintiff also testified that he experienced an enlarged scrotum and a urinary tract infection stemming from Defendants' failure to provide an adequate supply of catheters. *Id.* at 33-36.

On December 8, 2002, Plaintiff complained of being unable to urinate. The nurse on duty offered him a bed in the infirmary, which he refused. He was provided Tylenol for his discomfort, and a urine specimen container. His medical record was noted for follow-up with a Physician Assistant ("PA"). Later in the day, Plaintiff returned the urine sample to medical and again was offered a bed in the infirmary. He again refused the bed, and he also refused Tylenol.

On December 9, 2002, blood was noted in Plaintiff's urine sample, which was noted as being likely due to his self-catheterization technique, and a urinalysis was ordered. Two days later, Plaintiff returned to medical, complaining of testicular discomfort. The medical records indicate that Plaintiff's right testicle was hard, tender, and approximately four times larger than the left testicle. Plaintiff was given Tylenol for discomfort and was scheduled to meet with the doctor on December 13, 2002.

On December 12, 2002, Plaintiff reported to medical with complaints of back pain, but denied any scrotal discomfort. The PA notes indicated a 2x3cm mass that was firm and non-mobile. The PA further noted that a urinalysis was pending to rule out a urinary tract infection, and ordered a sonogram of Plaintiff's testes. The urinalysis laboratory results confirmed that no urinary tract infection was present.

Plaintiff was seen again on December 13, 2002. Medical notes indicate that his right testicle was enlarged, but was a non-painful area.

Plaintiff does not dispute that the named Defendants in this matter are not or were not DOCCS medical professionals, and were not involved in Plaintiff's medical treatment. Dr. David Dinello, Regional Medical Director for DOCCS, has no recollection and/or knowledge of the Plaintiff or his allegations, nor was he involved in grievances or complaints at the facility level.

<u>DISCUSSION</u>

I.      Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574 (1986). Regarding materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. More importantly, "summary judgment will not lie if the dispute about

a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Thus, the Court's function in deciding a summary judgment motion is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. When a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 250.

"In assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought." *Duse v. Int'l Business Machines Corp.*, 252 F.3d 151, 158 (2d Cir. 2001) (citing *e.g., Anderson*, 477 U.S. at 255). However, "[i]f the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to other elements of the claim become immaterial and do not suffice to defeat a motion for summary judgment." *Id., see also Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11-12 (2d Cir. 1986) (the existence of a factual issue will not suffice to defeat a motion for summary judgment where that issue is not material to the ground of the motion).

II.    Section 1983

42 U.S.C. § 1983 imposes liability on persons who, "under color of any statute, ordinance, regulation, custom, or usage, of any State," cause a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983; *see also Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994). Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States

Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979). "In this Circuit, personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [§] 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977).

III.    Defendant Henrich

Regarding Defendant Henrich, on May 18, 2016, Defendants' counsel filed a Suggestion of Death noting that Defendant Janice Henrich died on February 23, 2015.  ECF No. 90.

Under Rule 25(a) of the Federal Rules of Civil Procedure, "If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper party . . . . If the motion [for substitution] is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." There is no requirement that the notification of death of a party be filed by a party or the formal or appointed representative of the decedent's estate or that the statement identify the successor or legal representative of the decedent. *See Unicorn Tales, Inc. v. Banerjee*, 138 F.3d 467, 469-70 (2d Cir. 1998).

Plaintiff, who is represented by counsel, has not filed a motion for substitution pursuant to Fed. R. Civ. P. 25(a)(1). Contrary to Plaintiff's contention, Henrich was not sued in her official capacity, *see* ECF No. 108 ("Pl. Mem.") at 6, and Plaintiff was thus required to substitute a new party.  Fed. R. Civ. P. 25(d).  Accordingly, Plaintiff's claims against Defendant Henrich must be, and hereby are, dismissed.

IV.    Defendants' Motion for Summary Judgment

In their summary judgment motion, Defendants argue that: (1) Plaintiff's due process rights were not violated; (2) the supervisory Defendants in this action lack personal involvement;[6] (3) the Defendants did not retaliate against Plaintiff; (4) the Defendants were not deliberately indifferent to a serious medical need; (5) Plaintiff's equal protection rights were not violated; and (6) Plaintiff's conspiracy claims fail as a matter of law. ECF No. 102-1 ("Def. Mem.") at 3-30.

A.      *First and Fourteenth Amendment Claims*

Plaintiff claims that he was retaliated against for filing grievances regarding the IGRC when Defendants: (1) modified the IGP policies after his election to the IGRC to prevent him from moving freely about Five Points; (2) failed to provide Plaintiff with a wheelchair-accessible work desk; and (3) impeached him from his position as IGRC representative. Pl. Mem. at 7-8.

Because prisoner retaliation claims are easily fabricated and may intrude into matters of prison administration, the Court must approach Plaintiff's First Amendment retaliation claim with skepticism and particular care. *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

To establish a First Amendment retaliation claim, an inmate must show that: (1) he was engaged in constitutionally protected activity; (2) the defendants took adverse action against the plaintiff; and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).

It is well-established that "the filing of prison grievances is a constitutionally protected activity." *Davis v. Goord*, 320 F.3d 346, 352–53 (2d Cir. 2003). An adverse action is "retaliatory

---

[6]      In light of the Court's determination as discussed below, it need not address Defendants' argument for lack of personal involvement.

conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Gill*, 389 F.3d at 381 (internal quotation omitted).

To satisfy the causation requirement, Plaintiff must adduce facts "to support the inference that the speech played a substantial part in the adverse action." *Davis*, 320 F.3d at 354 (quotation omitted). There are a number of factors relevant to whether a causal connection exists, including: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *Colon v. Coughlin*, 58 F.3d 865, 872-73 (2d Cir. 1995); *accord Sloane v. Mazzuca*, No. 04 CV 8266, 2006 WL 3096031, at *14 (S.D.N.Y. Oct. 31, 2006). Yet, "even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." *Brown v. McGinnis*, No. 05-CV-758S, 2012 WL 267638, at *3 (W.D.N.Y. Jan. 30, 2012); *see also Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, however, a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred.")

Although Plaintiff's opposition brief almost exclusively addresses his third basis for the retaliation cause of action—removal from the IGRC—the Court will briefly discuss his other contentions.

With respect to the modification of the IGP policy regarding unrestricted movement about Five Points, it is undisputed by the parties that the policy was amended sometime in 2002, well before Plaintiff's IGRC term began in June of 2003. *See supra* at 11-12. This claim fails because Plaintiff cannot allege, much less raise an issue of fact, that any adverse action was causally related

to his filing grievances. The protected conduct must be "a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." *Graham v. Henderson*, 89 F.3d at 79. In this case, the adverse action—a policy prohibiting unrestricted movements by inmate representatives around Five Points—occurred prior to his election to the IGRC. No reasonable trier of fact could draw the inference that the Defendants anticipated Plaintiff's election to the IGRC and preemptively instituted a facility-wide policy in retaliation against Plaintiff for criticizing the IGRC. Accordingly, the alleged adverse actions are, "by definition—unconnected to [Plaintiff's] pursuit of [free speech]," which, in this case, was the filing of grievances. *Duffy v. Evans*, No. 11 Civ. 7605, 2013 WL 3491119, at *7 (S.D.N.Y. July 12, 2013).

Plaintiff also cannot show a causal connection between his grievances against the IGRC and the alleged denial of a wheelchair-accessible desk in the IGP office. Assuming Plaintiff requested such a desk, and assuming the denial of such a desk is an adverse action for purposes of his First Amendment claim, he does not allege a causal connection between the filing of grievances against the IGRC and adverse action. Because Plaintiff did not address the wheelchair-accessible desk in the context of his retaliation claim, *see* Pl. Mem. at 7-10, he has identified no facts regarding the particular grievances, when they were filed, or anything else that would permit an inference of a causal relationship.

Plaintiff's primary assertion relative to this claim is that he was impeached from the IGRC by Defendants for retaliatory purposes. Defendants do not challenge the characterization of Plaintiff's removal from the IGRC as an adverse action. Def. Mem. at 16-22.

Here, the undisputed facts establish that the alleged retaliatory actions of which Plaintiff now complains occurred shortly after Plaintiff engaged in protected activity, including, for example, a twelve-day period between Plaintiff's most recent grievance dated October 9, 2003,

and the October 21, 2003 notice by Defendant Henrich that he had been suspended from the IGRC. Notwithstanding the short period of time that suffices to establish temporal proximity between the alleged protected conduct an the adverse action, *see King v. McIntyre*, No. 11-CV-1457, 2015 WL 1781256, at *5 (N.D.N.Y. Apr. 8, 2015), a plaintiff alleging a First Amendment retaliation claim may not rely on temporal proximity alone to defeat summary judgment. *See Faulk v. Fisher*, 545 F. App'x 56, 58 (2d Cir. 2013) (although temporal proximity between protected conduct and adverse action constitutes circumstantial evidence of retaliation, "we have consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim").

Neither party addresses Plaintiff's prior disciplinary record *per se*. The record does indicate, however, that in connection with his service as an IGRC representative, Plaintiff: (1) questioned and/or objected to the applicability and meaning of Directive #4040 on July 2, 2003; (2) was reminded of grievance timeliness and office confidentiality on the same date; (3) received an Informal Counseling Memorandum regarding his duties and obligations as an inmate representative on July 7, 2003; (4) was observed to have performed poorly, did not conduct thorough investigations, and became argumentative during hearings on July 10, 2003; (5) was spoken with by Defendants Henrich and Lauber regarding his behavior, the purpose of the IGRC, and the importance of timeliness on July 23, 2003; (6) was observed to exhibit unruly behavior during a hearing and was noted to undermine the IGP process on July 24, 2003; (7) received a Formal Counseling Notification regarding his poor work performance on July 25, 2003; and (8) received a Formal Counseling Notification regarding his failure to thoroughly conduct and complete grievance investigations on August 1, 2003. Def. Ex. I at 337-363.

The Issuance of Counseling Memoranda continued into the fall months. After four additional memoranda detailing Plaintiff's work performance, which included issues with incomplete files, adversarial demeanor, and improper coding of grievances, Plaintiff was served with an impeachment recommendation and notification of impending hearing. Def. Ex. I at 73-87. Following the impeachment hearing, which ran for several days, Plaintiff signed a copy of the November 17, 2003, determination, which noted that Plaintiff provided "no real defense to the charges." Def. Ex. I at 69-70, 105. Plaintiff was found to have violated several rules of the IGRC Code of Ethics. In sum, Plaintiff has not established that he had a positive record of performance with the IGRC before the alleged protected conduct, or that he was vindicated at the hearing.

Inasmuch as Plaintiff seeks to allege a continuous pattern of retaliation, he still fails to establish a causal connection, because it is clear that Plaintiff continued to file grievances against the IGP department after Defendants Henrich and Lauber issued the allegedly retaliatory memoranda. Accordingly, Plaintiff was not deterred by Defendants' conduct and therefore he has not proffered sufficient evidence to establish a causal connection.

Even assuming Plaintiff has established a *prima facia* First Amendment retaliation claim, thus shifting the burden to Defendants, the record establishes that "even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003). "At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail." *Davidson v. Chestnut*, 193 F.3d 144, 149 (2d Cir. 1999) (per curiam). In the context of prison administration, "the conclusion that the state action would have been taken in the absence of improper motives is readily drawn . . . [because] we have been cautioned to recognize that

prison officials have broad administrative and discretionary authority over the institutions they manage." *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) (internal quotation marks omitted).

In this case, Defendants had legitimate, non-retaliatory reasons to impeach him from the IGRC. The IGRC Training Manual and Code are applicable to IGRC staff, inmate representatives, clerks, and the chairperson. The Code provides, in relevant part, that "[v]iolations of this code may result in dismissal from participation from the Grievance Program." Def. Ex. I at 77. Shortly after Plaintiff's election, he was counseled regarding his work product and confidentiality issues. Plaintiff was advised, throughout the course of his term as an inmate representative, of the IGRC purpose, duties, and the Code. He was observed to exhibit unruly and adversarial behavior and did not complete timely grievance investigations. Four months after his tenure began, Plaintiff was served with an impeachment recommendation which charged him with using the IGRC as an adversarial process and failing to follow staff direction. After the impeachment hearing, which lasted several days, it was determined that Plaintiff had violated certain of the Code rules.

The record establishes that Plaintiff, during his four-month period of service, almost continually exhibited poor performance and disruptive behavior, and was given multiple opportunities to correct his shortcomings by his superiors by verbal and written warnings. Plaintiff was found guilty of the charges by ample evidence, and that finding has not been overturned. Def. Ex. I at 68-70, 207. Because Defendants would have sought Plaintiff's removal from the IGRC even if Plaintiff had not filed grievances, Defendants have established "dual motivation" and are entitled to summary judgment with regards to Plaintiff's retaliation claims. *See Allred v. Knowles*, No. 06CV0456, 2010 WL 3911414, at *7 (W.D.N.Y. Oct. 5, 2010) ("Assuming, *arguendo*, that plaintiff could show that the disciplinary actions were motivated by retaliatory animus (an assumption that has no basis in the record before this Court), plaintiff's retaliation claims would

fail because defendants can easily show that they would have taken the same disciplinary actions even in the absence of the protected conduct.") (citing *Davidson v. Chestnut*, 193 F.3d 144, 149 (2d Cir. 1999) ("At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail.")).

C.    *ADA and Section 504 Claims*

Plaintiff alleges that Defendants discriminated and retaliated against him in violation of the ADA and the Rehabilitation Act. Pl. Mem. at 10-13.[7] Defendants, in turn, argue that the individual Defendants are not covered entities for purposes of the disability discrimination statutes, and that DOCCS is not a named defendant; and that Plaintiff's claims fail as a matter of law. Def. Mem. at 3-4.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of . . . a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, section 504 of the Rehabilitation Act "protects a 'qualified individual with a disability' from exclusion of participation, denial of the benefits, or subjection to discrimination 'under any program or activity receiving Federal financial assistance,' because of the individual's disability." *Harrington v. Vadlamudi*, No. 13-CV-0795, 2014 WL 4829483, *3 (N.D.N.Y. Sept. 29, 2014) (citing 29 U.S.C. § 749(a)). "[T]he standards adopted by Title II of the ADA for State and local government services are generally the same as those required under section 504" of the Rehabilitation Act. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

---

[7]    Although Plaintiff states that he was retaliated against in violation of the above-mentioned statutes, the pertinent portions of his opposition papers address only a claim of intentional discrimination claim on a failure-to-accommodate theory.

The Court need only briefly address Defendants' threshold arguments. First, DOCCS was in fact named as a defendant in this action. *See* 2d Am. Compl. at 3, ¶ 35; ECF No. 62 at 8. Second, the Attorney General of the State of New York filed a Notice of Appearance and motion papers seeking relief on behalf of all Defendants. *See* ECF Nos. 27, 58. Such an appearance on behalf of the unserved defendants constitutes a waiver of service. *See Coble v. Stinson*, 210 F.3d 354 (2d. Cir. 2000). Finally, as Plaintiff points out, the protections offered under both statutes extend to inmates in state correctional facilities. *See Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 213 (1998); *see* Pl. Mem. at 10.

Turning to the merits, "[t]o establish a violation under Section 504 or Title II, a plaintiff must demonstrate that (1) he is a qualified individual with a disability; (2) the defendant is subject to one of the Acts; and (3) he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of his disability." *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 196 (2d Cir. 2014) (internal quotation omitted). Here, Plaintiff's discrimination claims are premised upon DOCCS' alleged failure to make a reasonable accommodation. *See Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009).

It is undisputed that Plaintiff, who is confined to a wheelchair, is a qualified individual with a disability. As previously stated, the ADA "plainly covers state institutions without any exception that could cast coverage of prisons into doubt." *Yeskey*, 524 U.S. at 209. Here, the parties dispute whether, as a result of Plaintiff's disability, he was denied the benefit of full participation on the IGRC. Plaintiff contends that he verbally requested[8] a wheelchair-accessible desk and was not

---

[8] DOCCS Directive 2614(IV)(A) provides that an inmate request for accommodation may be made orally or in writing. If said request is made orally, the inmate "should be assisted in completing the Reasonable Accommodation Request Form." ECF No. 102-5 at 4, *et seq.* ("Def. Ex. B").

provided one, requiring him to work at a desk or table that was not designed for wheelchair accommodation, causing discomfort and requiring him to take additional time to complete his work. Pl. Mem. at 12. Defendants, on the other hand, maintain that Plaintiff never "filed a [written] reasonable accommodation request," ECF No. 102-5, ¶ 18, but could not recall if Plaintiff made a verbal request. Defendants further argue that even if Plaintiff had made such a request, DOCCS was not required to provide a wheelchair-accessible desk because there were a variety of other accessible work spaces available to Plaintiff at which he could use to fulfill his duties. Def. Mem. at 4-5.

While it is true that a public entity need not "provide a disabled individual with every accommodation he requests or the accommodation of his choice," *McElwee v. Cnty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012), an issue of fact exists as to whether Plaintiff requested a wheelchair-accessible desk. Moreover, "[d]etermining the reasonableness of an accommodation is a fact-specific question that often must be resolved by a factfinder." *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72–73 (2d Cir. 2016) (citation, internal quotation marks and brackets omitted). Given the factual dispute of whether Plaintiff requested and was denied a reasonable accommodation by Five Points administrators, a genuine issue of material fact exists that prevents the grant of summary judgment on Plaintiff's ADA and Rehabilitation Act claims. *Benimovich v. Fieldston Operating LLC*, No. 11 CIV. 780 RA, 2013 WL 1189480, at *8 (S.D.N.Y. Mar. 22, 2013) (denying summary judgment where disputed issue of fact existed as to whether the plaintiff requested and was provided a reasonable accommodation). Defendants' summary judgment motion is therefore denied on Plaintiff's failure to accommodate claim.

D.     *Due Process Claims*

Plaintiff claims that his due process rights were violated in connection with his impeachment from the IGRC. Pl. Mem. at 16-17.

DOCCS Directive 4040 provides, in relevant part:

> Before an elected inmate representative or an inmate representative who has permanently replaced an elected representative of the IGRC may be removed from his/her position on the committee or transferred to another facility, a limited due process hearing must be held. When the inmate is served with the notice of charges, the notice must indicate that the affirmation of these charges may result in removal from the IGRC. This hearing may be a disciplinary Tier III hearing or an IGRC impeachment hearing (procedurally the same as a Tier III hearing; see Part 254 of this Title). The hearing determines whether or not the representative should be removed from his/her representative position and for how long he/she should be precluded from holding a representative position. Although other sanctions may result from a disciplinary Tier III hearing, no other sanctions may result from an IGRC impeachment hearing.

N.Y.C.R.R. 7 § 701.4.

Because the IGRC impeachment hearing is procedurally identical to a Tier III disciplinary hearing, the Court utilizes the due process standards applicable to prison disciplinary proceedings. *Id.*

"Due process requires that a prison disciplinary hearing be impartial." *See Russell v. Selsky*, 35 F.3d 55, 59 (2d Cir. 1994) (citation omitted). However, the Second Circuit has held that "prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts," and "the degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citations omitted). According to the Second Circuit, "an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say . . . how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 569–70 (2d Cir.1990) (citation omitted).

To comply with procedural due process, prison authorities must provide an inmate charged with a violation in a disciplinary hearing with "advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004). The requirements of due process are satisfied if "some evidence" supports the conclusion of the disciplinary hearing. *Supt., Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985).

Plaintiff, who was served with a Recommendation for Impeachment on October 21, 2003 (seven days prior to his hearing), contends he was denied his right to call nine witnesses to testify on his behalf. Pl. Mem. at 16-17.

The record establishes that Plaintiff requested to call approximately 38 witnesses, four of whom refused to testify, one who was no longer was housed at Five Points, and nine whom were denied by Hearing Officer Napoli. Def. Ex. I at 98-101. Napoli determined that those witnesses were immaterial as they lacked direct knowledge of the issues regarding Plaintiff's hearing. *Id.* Although Plaintiff now complains that he was denied his request to call inmate witnesses Campbell, Divine, Hauk, Lashley, and Millard, the record is clear that Campbell did in fact testify on October 30, 2003, and that the remaining witnesses were never requested to be called. *Id.* at 91, 94, 105-06. Finally, Plaintiff concedes that two of those witnesses had no knowledge surrounding the charges against him. Def. Ex. H at 148-49. In total, 25 witnesses testified at Plaintiff's Impeachment hearing. Plaintiff's sole remaining challenge is to Napoli's determination that nine of the witnesses sought were immaterial.

A prisoner's right to call witnesses at a disciplinary hearing may be denied "on the basis of irrelevance or lack of necessity." *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991) (citations omitted). In exercising discretion to exclude evidence from a disciplinary hearing, a prison official:

> may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify, but [ ] they may do so either by making the explanation a part of the "administrative record" in the disciplinary proceeding, or by presenting testimony in court if the deprivation of a "liberty" interest is challenged because of that claimed defect in the hearing. In other words, the prison officials may choose to explain their decision at the hearing, or they may choose to explain it "later."

*Ponte v. Real*, 471 U.S. 491, 497 (1985).

The record evidence establishes no violation of Plaintiff's due process rights by Defendant Napoli. First, certain of Plaintiff's claims regarding witnesses are flatly contradicted by the undisputed facts. Second, Defendant Napoli completed a Witness Interview Notice for each of the nine witnesses, all of whom appear to be DOCCS administrators (including Napoli himself), indicating that the proposed witness either had no direct knowledge of Plaintiff's IGRC activities, the circumstances of impeachment, or the issues presented at the hearing. Def. Ex. I at 98-101. The Second Circuit has upheld the right of prison officials to refuse to call a witness whose testimony would be irrelevant or redundant. *See Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) ("The refusal to call witnesses whose testimony would be redundant is not a violation of any established due process right."); *see also Kalwasinski v. Morse*, 201 F.3d 103, 109 (2d Cir. 1999) (holding that hearing officer did not violate due process by failing to call fourteen requested witnesses who were not present during incident); *Russell v. Selsky*, 35 F.3d 55, 58–59 (2d Cir. 1994) (prison official "did not violate any clearly established constitutional or statutory right" when he refused to permit

inmate's requested witnesses to testify where the witnesses' testimony would have been "duplicative or non-probative").

Significantly, Plaintiff's hearing included testimony from 25 witnesses. Although he states, in conclusory fashion, that "the record demonstrates that Plaintiff was denied the right to call nine witnesses to testify on his behalf," there is no evidence in the record that the testimony of any of the prison administrators would have changed the result of his hearing had they been permitted to testify, nor does he identify what those witnesses would have testified to. He has therefore failed to demonstrate any prejudice in connection with the alleged denials by showing that they affected the outcome of the hearing. *See, e.g.*, *Clark v. Dannheim*, 590 F. Supp. 2d 429, 429 (W.D.N.Y. 2008) (citing *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991)) (other citations omitted). As a result, there is no triable issue of fact as to whether Plaintiff had an opportunity to appear and call witnesses, and Plaintiff's due process claim must therefore be dismissed.

E.      *Eighth Amendment Claims*

Plaintiff alleges that his Eighth Amendment rights were violated when he was denied proper medical care insofar as he was not provided adequate wheelchair maintenance, hand and wrist splits, and a sufficient supply of proper catheters. Pl. Mem. at 21-23.

In order to establish a violation of the Eighth Amendment arising out of inadequate medical treatment, Plaintiff must prove that Defendants acted with "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The "deliberate indifference" standard has both objective and subjective components. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To satisfy the objective component, the alleged medical need must be "sufficiently serious." *Id.* A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Id.* "Factors that have been considered include the existence of an

injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

To satisfy the subjective prong, a plaintiff must show that a defendant acted with a "sufficiently culpable state of mind" in depriving him of adequate medical treatment. *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). "The subjective element of deliberate indifference entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* In order to be found "sufficiently culpable," the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; [ ] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

More than medical malpractice is required to establish a constitutional violation. "Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness." *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011). Mere negligence is not actionable, *see Estelle*, 429 U.S. at 106, nor is a disagreement over the proper treatment. *Chance*, 143 F.3d at 703.

In opposition to Defendants' motion for summary judgment, Plaintiff focuses on the issuance of catheters by medical staff at Five Points. Pl. Mem. at 21-23. Plaintiff, who is represented by counsel, does not address Defendant's remaining arguments with respect to Point VII of the Defendant's memorandum, making only a cursory reference to unidentified medical staff "fail[ing] to properly maintain his wheelchair, and den[ying] him appropriate wrist splints,"

with no further discussion.  *See* Pl. Mem. at 21-31; Def. Mem. at 21-26.  As such, the Court finds that Plaintiff has abandoned his claims relating to Defendants' alleged failure to provide adequate wheelchair maintenance and denial of hand and wrist splints,[9] and dismissal of Plaintiff's Eighth Amendment claims on those grounds is therefore warranted. *See Frontera v. SKF USA, Inc*., No. 07-CV-563-JTC, 2010 WL 3241123, at *10 (W.D.N.Y. Aug. 16, 2010) (granting summary judgment on the basis of abandonment where the plaintiff failed to respond to the defendant's arguments); *Avola v. Louisiana-Pacific Corp*., 991 F. Supp. 2d 381, 390 (E.D.N.Y. 2013) (granting summary judgment on five claims not directly opposed in the plaintiff's opposition papers); *Douglas v. Victor Capital Group*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (finding claims abandoned where plaintiff failed to address claims in opposition to defendants' summary judgment motion) (citations omitted).

With regard to the issuance of catheters, Plaintiff attempts to establish a claim of deliberate indifference based upon a disagreement about treatment.[10] While Plaintiff appears to contend that medical staff at Five Points was deliberately indifferent because his catheters were provided in varying quantities throughout his time, *see supra* at 9-11, he does not indicate how many catheters per week were required for his condition. Indeed, Plaintiff has submitted nothing to refute Dr. Dinello's assertion that Plaintiff's treatment was consistent with the prevailing standards of medical care. ECF No. 102-4, ¶ 47.  The record also indicates that Plaintiff was regularly provided

---

[9]     In any event, both of Plaintiff's claims are belied by the record evidence and undisputed facts.

[10]     Defendants do not squarely address whether Plaintiff's need for catheters constitutes a serious medical need. *See* Def. Mem. at 22. The Court assumes, without deciding, that his condition satisfies the objective component of the deliberate indifference standard. *See, e.g., Woods v. City of Utica*, 902 F. Supp. 2d 273, 283 (N.D.N.Y. 2012) ("The County defendants do not seriously dispute that Woods, a paraplegic who requires the use of a catheter to urinate and suppositories to maintain regular bowel movements, suffers from a serious medical condition.").

with his catheters, instructions on how to use them, and that he was provided additional supplies whenever he requested them. ECF. No. 102-4 ("Def. Ex. A").

Although Plaintiff repeatedly references a Court Order from the Southern District of New York dated January 31, 2002, *see* ECF No. 110-14,[11] he nonetheless fails to identify any evidence in the record indicating that the failure to provide a specific number of catheters was medically insufficient, or that it represented a deliberate indifference to any serious medical risk. The only other evidence that Plaintiff points to in support of his position is his own declaration, in which he contends that he was "only provided urinary catheters on a sporadic basis with varying amounts." West Decl., ¶ 44, *et seq.*

It is well-settled that "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703. Here, Plaintiff's opinion that he was not provided an adequate supply of catheters does not raise a material issue of fact on the subjective component of a deliberate indifference claim. *See Hicks v. Meko*, No. 09–01–HRW, 2009 WL 2043556 (E.D. Ky. July 13, 2009) ("Nor does [the plaintiff's] disagreement with his physicians regarding the frequency of replacing a catheter state a cognizable constitutional claim."); *Morgan v. Mississippi*, No. 2:07cv15, 2009 WL 1609060, at *7–10 (S.D. Miss. June 8, 2009) (rejecting deliberate indifference claim predicated upon prisoner's concern about developing urinary tract infection because physician ordered only

---

[11] Plaintiff's Conditional Discharge Order was issued in connection with a class action suit brought by prisoners at Green Haven in 1979 for alleged violations of their rights through denial of necessary medical treatment. The parties entered into a settlement, which was modified several times and ultimately embodied in the Consent Decree on September 27, 1991. The Conditional Discharge Order followed, setting forth various parameters and provisions related to Plaintiff's medical care upon his discharge to Five Points, including that Plaintiff "shall be provided with an adequate supply of urinary catheters in his cell." *See* Pl. Ex. 14, ¶ 12, ECF No. 110-14.

one new external catheter per week and new leg bag per month); *McGiffin v. Clayton*, No. 6:07cv184, 2008 WL 416929, at *4–5 (E.D. Tex. Feb. 13, 2008) (plaintiff-prisoner's allegations regarding delays in receiving new catheters and frequency of replacement constituted disagreement regarding sufficiency of medical care, a claim sounding in medical malpractice rather than deliberate indifference); *Jenkins v. Mohr*, No. 2:14-CV-248, 2014 WL 4748619, at *5 (S.D. Ohio Sept. 23, 2014), *report and recommendation adopted*, No. 2:14-CV-248, 2014 WL 7403992 (S.D. Ohio Dec. 30, 2014) ("The Complaint demonstrates that plaintiff disagrees with defendants about the frequency with which his catheters should be replaced. Such a disagreement does not, however, amount to a constitutional violation.").

Finally, Plaintiff claims that the "repeated use of single-use catheters caused Plaintiff painful urination, blood in his urine, and a painful scrotal enlargement." *See* Pl. Mem. at 23.[12] The record indicates that Plaintiff complained of scrotal discomfort lasting two to three days, and that his test for a urinary tract infection was negative. Def. Ex. A. Defendants contend that these symptoms have been held not to constitute sufficiently serious medical conditions for purposes of an Eighth Amendment claim. Def. Mem. at 24. In support of their position, Defendants cite to *Ford v. Phillips*, No. 05 Civ. 6646, 2007 WL 946703, at *12 & n.70 (S.D.N.Y. Mar. 27, 2007) (bruises, abrasions, and blood in urine did not give rise to a medical indifference claim), and *Tapp v. Tougas*, No. CIVA905CV01479, 2008 WL 4371766, at *9 (N.D.N.Y. Aug. 11, 2008), *report and recommendation adopted in part, rejected in part*, No. 05-CV-1479, 2008 WL 4371762 (N.D.N.Y. Sept. 18, 2008) (allegations of "swollen testicles, blood in urine & stool, lower back pain, bruises to [his] wrist & face," even if credited, did not set forth a "sufficiently serious"

---

[12] The Court notes that neither party explains what is meant by "single-use." The medical records indicate that the catheters issued were vinyl, but are unclear as to whether single-use is defined as disposable (one-time use) or to be used by a single individual.

condition)). Plaintiff's complained-of symptoms (enlarged scrotum, scrotal and urinary pain, and blood in the urine) were arguably more serious than in the cases cited by Defendants. Moreover, the *Ford* court addresses scratches and bumps as not being sufficiently serious, and with regard to the plaintiff's urinary complaints, he could not establish the subjective component of a deliberate indifference claim because the medical defendants "continued to monitor the plaintiff's possible internal injuries, such as blood in his urine, until the symptoms subsided." *Ford*, 2007 WL 946703 at *12. The Court finds that *Ford* better supports the position that urinary pain and blood in the urine can present a sufficiently serious condition capable of causing extreme pain. *See Hathaway*, 37 F.3d at 66.

But even assuming that Plaintiff's conditions were "sufficiently serious," the record nonetheless establishes that Plaintiff was repeatedly offered medical care at Five Points, and he rejected it. *See supra* at 9; *see generally Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000) (facts must give rise to a reasonable inference that the persons charged with providing medical care knew of those serious medical needs and intentionally disregarded them). He therefore cannot establish the subjective component of the deliberate indifference test. Finally, the record does not substantiate his claim that his ailments were caused by re-using single-use catheters, but were rather likely due his self-catheterization technique. *See* Def. Ex. A. He submits no evidence, other than his own conclusory allegations, to the contrary.

For all of these reasons, Plaintiff's Eighth Amendment claim of deliberate indifference must be dismissed.

F.     *Equal Protection / Conspiracy Claims*

Plaintiff, who is African-American, claims that certain of the Defendants violated his Equal Protection rights by not permitting him access to the facility to conduct IGRC investigations, when

Caucasian and Latino IGRC representatives were previously permitted to do so. Pl. Mem. at 17-19.

The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly-situated people alike. *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citing *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). Generally, the equal protection clause has been "concerned with governmental 'classifications that affect some groups of citizens differently than others.'" *Engquist v. Or. Dep't of Agric.*, 533 U.S. 591, 601 (2008). Racial and/or religious discrimination in prisoner job assignments is a violation of the Equal Protection Clause. *LaBounty v. Adler*, 933 F.2d 121, 123 (2d Cir. 1991); *Bussey v. Phillips*, 419 F.Supp.2d 569, 588–89 (S.D.N.Y. 2006).

"To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005); *see also Brown v. City of Syracuse*, 673 F.3d 141, 151 (2d Cir. 2012). For prisoners asserting an Equal Protection claim, a plaintiff "also must show that the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not 'reasonably related to [any] legitimate penological interests.'" *Phillips*, 408 F.3d at 129 (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001)). "The government can treat persons differently if they are not 'similarly situated.'" *Yuen Jin v. Mukasey*, 528 F.3d 143, 158 (2d Cir. 2008) (alteration and quotation marks omitted).

Here, Plaintiff submits no evidence sufficient to raise a triable issue of fact that he was treated differently or intentionally discriminated against as an African-American inmate. The parties do not dispute that prior to Plaintiff's election to the IGRC, African-American, Caucasian,

and Latino inmates had served in the position, and those inmates were permitted access to the entire Five Points facility to conduct IGRC investigations, and that the rule permitting IGRC representatives to move freely about the facility to conduct IGRC investigations was suspended sometime in 2002, prior to the date that Plaintiff's term began in June of 2003. *See* Def. Exs. D & H. Plaintiff does not argue, much less submit any proof, that the restriction in facility access was either racially motivated or that it was applied to him and not other, similarly-situated inmates. Pl. Mem. at 18.

Moreover, Defendant Lauber testified that the policy permitting IGRC inmate representatives to move freely about the facility to conduct investigations was suspended shortly after she began her job at the IGRC office in 2002. Def. Ex. D at 17-18, 39. While it was not her decision, she believed the policy change was enacted because Five Points is designated as a maximum security prison and as such, allowing unrestricted movement throughout the facility would be problematic as it is not permissible for inmates to be in housing units to which they are not assigned, and each IGRC inmate representative would need to be escorted throughout Five Points to conduct investigations. *Id.* at 14-20, 81-82. Thus, even if there was a disparity in treatment, which the record evidence plainly refutes, a policy denying unrestricted facility access to IGRC inmate representatives can serve as a legitimate penological interest of prison order and security. *See, e.g., Jean-Laurent v. Los*, No. 12-CV-132, 2015 WL 1015383, at *9 (W.D.N.Y. Mar. 9, 2015) (Prison's enforcement of policy prohibiting inmates to move freely about the facility was related to a valid penological interest and "pose[d] little hardship on Plaintiff's free exercise of his religion or to Plaintiff's access to the courts.").

Plaintiff has failed to raise an issue of fact as to whether he was the subject of intentional discrimination on the basis of his race, and therefore the Defendants are entitled to summary judgment on his Fourteenth Amendment Equal Protection claim.

Because Plaintiff's § 1985(3) conspiracy claim is premised upon the same allegations, *see* Pl. Mem. at 18-19, it must necessarily fail. To establish a conspiracy claim pursuant to 42 U.S.C. §§ 1983 and 1985, a plaintiff first must establish an underlying deprivation of a constitutional right. *Romer v. Morgenthau*, 119 F.Supp.2d 346, 363 (S.D.N.Y. 2000) ("[a] violated constitutional right is a natural prerequisite to a claim of conspiracy to violate such right."). Summary judgment is therefore appropriate in favor of Defendants on the conspiracy claim as well.

G.    *Title VII Claim*

Finally, Plaintiff attempts to bring a Title VII claim against Defendants on the basis that he allegedly was subjected to illegal discrimination and retaliation during his participation as an IGRC representative. Pl. Mem. at 14-16. Federal courts have repeatedly held that Title VII, an employment discrimination statute, does not apply to inmates who are assigned to prison jobs. *See Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991) (inmate was not "employee" under Title VII because his relationship with defendants arose from his status as inmate, not as employee); *Wilkerson v. Samuels*, 524 F. App'x 776, 779 (3d Cir. 2013) (protections afforded under Title VII did not apply to prisoners' job in prison factory); *Iheme v. Smith,* 529 F. App'x 808, 809 (8th Cir. 2013) (inmate worker should not be treated as an "employee" for purposes of Title VII); *Stile v. Fed. Bureau of Prisons*, No. CV 16-3832, 2016 WL 8710396, at *6 (D. N.J. Aug. 26, 2016) (same); *McCaslin v. Cornhusker State Indus.*, 952 F.Supp. 652, 657 (D. Neb. 1995) (concluding that Title VII does not apply to prisoners working in a prison setting); *Smith v. Sumner*, No. 11CV39MLM (E.D. Mo. 2011), 2011 WL 4342617 at *6 ("Title VII does not apply to the prisoner working in

the state prison, for the state prison industry as part of his or her sentence"); *Jones v. Lockett*, NO. CIV.A 08–16 (W.D. Pa. 2009), 2009 WL 2232812 at *5 (citing several federal cases supporting the conclusion that prison inmates are not employees for purposes of Title VII).

Based on this ample authority, Plaintiff does not have a covered employment relationship with the Defendants that would allow him to pursue a discrimination claim against them under Title VII.  Summary judgment is appropriate in favor of Defendants on this claim.

CONCLUSION

For all of the foregoing reasons, the Defendants' Motion for Summary Judgment (ECF No. 102) is GRANTED IN PART AND DENIED IN PART. Specifically, the Motion is DENIED with respect to Plaintiff's claims alleging discrimination and retaliation in violation of the ADA and the Rehabilitation Act.  The Motion is GRANTED with respect to the remaining causes of action, and Plaintiff's First Amendment, Title VII, Due Process, Equal Protection, Deliberate Indifference, and Conspiracy claims are dismissed without prejudice.

Defendants Case, Keefe, Lauber, and Pabon remain in this action as relevant to Plaintiff's ADA and Rehabilitation Act claims.  Plaintiff's claims against Defendant Henrich are dismissed by operation of Fed. R. Civ. P. 25(a)(1), and all other named Defendants are dismissed from this action in accordance with the above Decision and Order.

IT IS SO ORDERED.

DATED:     July 31, 2017
           Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court